1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| MEREDITH BEAGLE and JORDAN GUERRERO on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC. and AMAZON.COM SERVICES LLC.<br><br>Defendants. | No.: 2:24-cv-00316<br><br>**COMPLAINT—CLASS ACTION**<br><br>DEMAND FOR JURY TRIAL |

17    Plaintiffs Meredith Beagle ("Beagle") and Jordan Guerrero ("Guerrero"), individually and

18 on behalf of a class of similarly situated individuals, by and through their undersigned counsel,

19 bring this class action against Defendants Amazon.com, Inc. ("Amazon Inc.") and Amazon.com

20 Services LLC ("Amazon Services") (collectively "Defendants") for violating the Video Privacy

21 Protection Act ("VPPA") and the Washington Consumer Protection Act ("WCPA").  Plaintiffs

22 allege the following upon information and belief, except as to allegations specifically pertaining

23 to each of their respective claims, which are based on each client's personal knowledge:

24

## I.     PRELIMINARY STATEMENT

1.      "[P]eople ought to be able to read books and watch films without the whole world knowing."[1] It is important for people to be able to "watch films without the whole world knowing," because disclosure of a consumer's private information allows for weaponization and consumer profiling.

2.      Weaponization of private data allows others to use a consumer's data against the consumer. One example of this is the risk of consumers' private data being disclosed and potentially used against them in the hiring process.[2] Another example involves an angry spouse in a child custody proceeding using video records to argue that the other parent is not fit to have custody.[3] These two examples of weaponization have actually happened, but there are countless other ways this data could be misused to hurt a consumer.

3.      In addition to potential weaponization, this private data can also be used to create consumer profiles and commercialized. Even in the late 1980s, before the internet was popular and when the VPPA was under Senate consideration in committee, Senator Patrick Leahy observed and denounced this growing risk to privacy, stating: "[I]n an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and 6 telephones, all lodged together in computers, it would be relatively easy **at some point** to give a **profile of a person** and tell what they buy in a store, what kind of food they like, what sort of television

---

[1] Joint hearing of the Senate Judiciary Subcommittee on Technology and the Law and the House Judiciary Subcommittee on Courts, Civil Liberties, and the Administration of Justice, 100 Cong. p. 10 (held on August 3, 1988) (Statement of Representative Al McCandless).

[2] The original impetus for the VPPA was the disclosure of United States Supreme Court nominee Judge Robert H. Bork's video rental list.

[3] The Senate Judiciary Committee Report on the VPPA noted one occasion when "the attorney for a woman in a child custody proceeding made an informal request for the records of every film rented by her husband in an effort to show that, based on his viewing habits, he was an unfit father." The Video Privacy Protection Act of 1988 - Report, Mr. Biden, from the Committee on the Judiciary (Oct. 21, 1988).

---

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

2

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

programs they watch, who are some of the people they telephone. I think that is wrong. **I think that really is Big Brother, and I think it is something that we have to guard against**."[4]

4.      More than 30 years later, the once-hypothetical risk Senator Leahy identified is now a reality. Defendants have amassed consumer data and built consumer profiles. For example, through its Whole Foods subsidiary, Amazon Inc. knows what kind of foods we like. Through Amazon Echo, Amazon Inc. knows who we call on the phone. And through Amazon Prime Video (operated by Amazon Services), Amazon knows what television programs and movies we watch.

5.      But unlike food and phone calls, thanks to the VPPA, there are limits on what information Amazon Services can legally disclose to Amazon Inc., other affiliates, and third parties based on what we watch. Generally, under the VPPA, a video service provider, such as Amazon Services, cannot disclose the personally identifiable information ("PII") of a renter, purchaser, or subscriber of its goods or services.[5] PII includes any information identifying a consumer as having requested or obtained specific video materials or services from a video tape service provider.[6]

6.      As explained herein, Amazon Services discloses PII to its parent company—Amazon Inc.—on a regular basis in violation of the VPPA, and the WCPA. Amazon Services discloses consumers' PII to Amazon for audience measurement purposes, marketing purposes, market research purposes, advertising purposes, and other data collection and analysis purposes. None of these services are in the ordinary course of business as defined by the VPPA. Upon information and belief, Amazon Services discloses PII to other Amazon affiliates as well.

---

[4] Hearings on Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the United States Before the Senate Committee on the Judiciary, 100th Cong., 1st Sess. 1372, 1374 (Sept. 28, 1987) (emphasis added).

[5] 18 USCS § 2710(b)(1).

[6] 18 USCS § 2710(b)(2)(B)(i).

---

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

7.     Amazon Services also discloses consumers' PII to other non-Amazon affiliated third parties for audience measurement purposes and market research without explicit, separate, and written consent or the opportunity to opt-out.

8.     The VPPA provides a handful of exceptions to the prohibition on disclosing PII, such as disclosure to a law enforcement agency pursuant to a warrant; disclosure to anyone with informed, written consent; disclosure to the consumer himself or herself; and disclosure incident to the video tape service provider's ordinary course of business.[7] Two of the exceptions most relevant here are the ordinary course of business exception and the informed, written consent exception. Neither one applies to Amazon Services' disclosures to Amazon.

9.     The VPPA narrowly defines "ordinary course of business." It only includes debt collection, order fulfillment, request processing, and transfer of ownership.[8] But, as described herein, Amazon Services discloses PII for other, unauthorized purposes, such as marketing.

10.    The informed consent exception is also subject to specific statutory requirements. It requires a video service provider to obtain the explicit, informed, and written consent of the consumer before or contemporaneously with disclosure of the consumer's PII.

11.    Unlike in food or telecommunications sectors, where "Americans are forced to provide to businesses and others personal information without having any control over where that information goes," the VPPA empowers consumers in the video sector to control their data by regulating when and to whom certain data can be disclosed and for what purposes.[9]

---

[7] 18 USCS § 2710(b)(2).

[8] 18 U.S. Code § 2710(a)(2).

[9] 134 Cong. Rec. S5401 (May 10, 1988) (statement of Senator Paul Simon) (noting when the Senate introduced the VPPA that "Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes, and dislikes.").

12.     This informed consent exception has a form requirement, a timing requirement, and an opt-out requirement. These elements work in tandem to make sure consumers have actual knowledge—on the front end—of the specific video privacy rights they are giving away, and it provides them a way to opt-out.

13.     To satisfy the form requirement, informed consent must be presented in "a form distinct and separate from any form setting forth other legal or financial obligations of the consumer."[10]

14.     As one court has explained, "the plain language of the VPPA does indeed require video tape service providers to (1) request consumers' consent to a privacy disclosure that addresses only the use of personally identifiable information connected with video purchases and no other privacy topic, and (2) obtain the act of consent separately from the consumer's agreement to the retailer's terms of use, general privacy policy, and the commercial terms of the purchase."[11]

15.     To satisfy the timing requirement, consent must be obtained either contemporaneously with or in advance of the disclosure sought—not after-the-fact.

16.     Finally, the video service provider must give an opportunity, in a clear and conspicuous manner, for the consumer to withdraw from any disclosure of his or her PII.

17.     Amazon Services—the video service provider for United States Amazon Prime Video consumers—does not comply, and has never complied, with the VPPA's requirements for informed written consent. Amazon Services[12] *repeatedly admits* that Amazon Services shares consumer data with Amazon Services affiliates like Amazon Inc.

---

[10] 18 USCS § 2710(a)(3).

[11] *Cappello v. Walmart Inc.*, No. 18-CV-06678-RS, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019).

[12] Defendants' Conditions of Use and Privacy Notice are vague about which Amazon entities the Conditions of Use and Privacy Notice refer to. For example, the Privacy Notice describes "how Amazon.com and its affiliates (collectively 'Amazon') collect and process your personal information," lumping Amazon Inc. and Amazon Services together for purposes of the Privacy Notice.

18.     Additionally, reports from former Amazon information security professionals have described a data "free-for-all" within the Amazon empire. In other words, there is a free flow of data from Amazon Services to Amazon Inc. These data disclosure practices are more systemic than sending this data through one-off disclosures (such as through encoded pixels). Instead, Amazon Services maintains a virtual "warehouse" of data that it collects from consumers who are unable to opt-out and gives Amazon Inc. access to that database.

19.     Instead of a distinct and separate form governing video PII, Defendants bury all their privacy-related "disclosures" in a maze of hyperlinks and fine print.

20.     Amazon Services also does not provide consumers the opportunity to opt out of disclosing this information to affiliated Amazon entities. Instead, if customers wish to protect their PII from flowing to other Amazon entities, their only option is to forego the use of Amazon Services or risk a drop-off in services provided.

21.     Because of Amazon Services' systematic and repeated violations of the VPPA, Plaintiffs and the other Class Members seek damages and injunctive relief to protect their PII.

22.     Amazon Services and Amazon Inc.'s practices also violate the WCPA under RCW 19.86.020. The WCPA also prohibits Defendants' actions. The WCPA declares all unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as unlawful,[13] which includes Amazon Services unlawful violations of VPPA. Amazon Services' practices in violation of the WCPA include misleading Class Members about what identifying

---

[13]  RCW § 19.86.010 *et seq.*

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

information is collected and the fact that it is disclosed; failing to provide an opt-out mechanism; and failing to timely destroy records.[14]

23.     Amazon Inc.'s misleading and unfair practices include its knowing participation in accessing this ill-gotten information and using it to the detriment of its consumers. Amazon Inc. also creates and oversees the confusing maze of fine print used by its subsidiaries, including Amazon Services.

24.     Due to Defendants' unfair, or in the alternative, deceptive practices, Plaintiffs seek actual damages incurred and/or nominal damages for themselves and the Class Members for this invasion of privacy, as well as reasonable attorneys' fees.

## II.     PARTIES

25.     Plaintiff Beagle is a citizen of Charles City County in the State of Virginia. She is of the full age of majority.

26.     Plaintiff Guerrero is a citizen of the Parish of Orleans in the State of Louisiana. He is of the full age of majority.

27.     Amazon Inc. is a Delaware corporation with its principal place of business in Seattle, Washington.

28.     Amazon.com Services is a Delaware limited liability company with its principal place of business in Seattle, Washington. Amazon Services is a wholly-owned subsidiary of Amazon Inc.

29.     Because of the central role Amazon Inc., Amazon Services, and other Amazon affiliates play in American society, Defendants' own fine print, news articles, and other sources often simply

---

[14] The VPPA requires destruction of PII "as soon as practicable, but no later than one year from the date the information is no longer necessary for the purpose for which it was collected and there are no pending requests or orders for access to such information…" 18 USCS § 2710(e). Because the VPPA does not include a cause of action for violations of this destruction requirement, this Complaint only brings a failure to destroy claim pursuant to the WCPA.

refer to "Amazon" or "Amazon.com" without specifying which entity or entities are specifically being referenced.  In such circumstances, the affiliate is referenced herein simply as "Amazon."

### III.    JURISDICTION AND VENUE

30.    This Court has diversity jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). This complaint states claims on behalf of a national class of consumers who are minimally diverse from Defendants. The amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

31.    This Court also has federal question jurisdiction under 28 U.S.C. § 1331 as this action arises, in part, under a federal statute, the VPPA.

32.    This Court has personal jurisdiction over Defendants because some of the acts alleged herein were committed in the state of Washington and because Defendants are registered to do business in this state and systematically and continuously conduct business in this state.[15]

33.    Venue is proper in this District under 28 U.S.C. § 1391(b) as to Amazon Inc. and Amazon Services because they (1) are both headquartered in this District; (2) transact business in this District; and (3) transacted business in this District at the time the cause of action arose.

### IV.    GENERAL ALLEGATIONS

**A.    Amazon, Inc. has a well-documented history of providing misleading and incomplete information to consumers about the use, storage, and disclosure of their personal information.**

34.    Amazon Inc. is a huge, multinational corporation headquartered in Seattle, Washington. As of January 2024, Amazon Inc. has a market capitalization of $1.630 trillion.

---

[15] Defendants have also explicitly chosen to avail themselves of the laws of Washington. Defendants' Conditions of Use contain a choice of law agreement that states that "applicable federal law, and the laws of the state of Washington" govern all consumer disputes with Defendants.

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

8

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

35.     Amazon Inc. has been the subject of consumer protection actions and inquiries. In fact, on June 21, 2023, the Federal Trade Commission ("FTC") filed a lawsuit against Amazon Inc. for violations of the Federal Trade Commission Act and the Restore Online Shoppers' Confidence Act.[16]

36.     In *FTC v. Amazon.com, Inc.*, the FTC addressed specific unfair and deceptive practices by Amazon Inc. Specifically, the FTC explained that Prime Video is a distinct product from Prime, since Prime Video is a subscription-based video streaming service. As alleged by the FTC, although it is possible to sign up for Prime Video alone, it is difficult to do so. In the ongoing lawsuit, the FTC alleges that Amazon Inc.'s dark patterns trick consumers into signing up for Prime instead of Prime Video, which would be a lower-cost option.

37.     Once consumers have signed up, the FTC further alleges that Amazon Inc. knowingly complicates the cancellation process for Prime subscribers who sought to end their membership. As explained by the FTC, up until recently, "the primary purpose of the Prime cancellation process was not to enable subscribers to cancel, but rather to thwart them. Fittingly, Amazon named that process "Iliad," which refers to Homer's epic about the long, arduous Trojan War. Amazon designed the Iliad cancellation process ("Iliad Flow") to be labyrinthine, and Amazon and its leadership slowed or rejected user experience changes that would have made Iliad simpler for consumers because those changes adversely affected Amazon's bottom line. As with nonconsensual enrollment, the Iliad Flow's complexity resulted from Amazon's use of dark patterns—manipulative design elements that trick users into making decisions they would not otherwise have made."[17]

---

[16] *Federal Trade Commission v. Amazon.com, Inc.*, 2:23-cv-00932 (W.D. Wash. 2023).

[17] *Id.* at 3.

38.     Once consumers are in the Amazon system, Defendants amass data profiles for consumers with little regard for protecting their privacy. Former Amazon chief information security officer Gary Gagnon described Amazon's internal access policies for customer information as a "free-for-all" among Amazon's global workforce.[18]

39.     One former, U.S.-based information security professional from Amazon explained that, "Amazon has grown so fast, it doesn't know what it owns . . . They don't know where their data is at . . . ."[19]

40.     One former employee stated: "We found hundreds of thousands of accounts where the employee is no longer there but they still have system access."[20]

41.     Despite Amazon Inc.'s proclamations of the separateness of its entities when it suits its purposes and its insistence that it values consumer privacy, Amazon Services uses similar patterns of misdirection, confusing language, and fine print to minimize the privacy violations it and its affiliates participate in.

**B.      Amazon Services' fine print does not satisfy the VPPA's strict requirements regarding the disclosure of consumers' PII-related video usage history.**

42.     Amazon Services' "disclosures" pertaining to the use of consumer information and consumer privacy are intentionally scattered throughout a series of online pages that must be navigated via a maze of misleading hyperlinks. The "disclosures" acknowledge that Amazon Services can and is sharing PII-related video usage history with both Amazon affiliates and unaffiliated third parties, but not in the separate, distinct format mandated by the VPPA and not

---

[18] https://revealnews.org/article/inside-amazons-failures-to-protect-your-data-internal-voyeurs-bribery-schemes-and-backdoor-access/.

[19] https://www.politico.eu/article/data-at-risk-amazon-security-threat/.

[20] https://www.politico.eu/article/data-at-risk-amazon-security-threat/.

with a clear notification of the right to opt-out.

43.     Examples of Amazon Services' own acknowledgment of disclosures include admissions in the Privacy Notice ("We share customers' personal information . . . with subsidiaries Amazon.com, Inc. controls"); on the "Your Ads Privacy Choices" page ("Privacy Choices page") ("If you opt out [of cross context behavioral ads],[w]e'll continue to share your data with our co-branded subsidiaries. We'll also continue to show you ads based on your activity on Amazon's sites and apps and those of our co-branded subsidiaries."); and on the "Advertising Privacy and Preferences" page ("If you choose not to be shown interest-based ads above, we won't: Use information about your use of our store and services to deliver ads to you **off of Amazon's own properties"** [but, by implication, *will* continue to target ads on Amazon's own properties]) (original emphasis removed, current emphasis added).

44.     And while there is an inadequate opt-out for some information as to unaffiliated third parties, there is no opt-out at all for Amazon affiliates. Instead, Amazon Services' maze of fine print says that consumer data will be shared among its affiliates.

45.     As described below, even though Defendants' fine print admits that Defendants collect and disclose consumers' data, Defendants do not obtain consumers' consent nor provide a clear and conspicuous opt-out.

46.     The registration process to create a new Amazon or Amazon Prime Account—both of which include at least some level of Prime Video access—instead presents consumers with a maze of hyperlinks and fine print. First, a consumer is prompted to fill in his or her name, email, and password. There is no specific reference to video privacy disclosure, and consumers are not presented with an opt-out option. Instead, in fine print at the bottom, consumers are simply told, "By creating an account, you agree to Amazon's Conditions of Use and Privacy Notice." That disclaimer contains hyperlinks to the Conditions of Use and Privacy Notice.

CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                            11

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15   47.     Consumers are not required to check a box indicating that they have agreed to the

16   Conditions of Use and Privacy Notice before proceeding.

17   48.     Consumers are not required to scroll through the text of the Conditions of Use and Privacy

18   Notice before proceeding.

19   49.     Neither the Conditions of Use nor the Privacy Notice contain a request for consent or an

20   opt-out provision.

21

22

23

24

CLASS ACTION COMPLAINT                                   Duncan Law, PLLC
No. 2:24-cv-00316                          12            451 SW 10th St, Ste. 215
                                                         Renton, WA 98057
                                                         (206) 237-7714

50.    If a consumer clicks on "Conditions of Use," the consumer is directed to a lengthy page of fine print.[21]

51.    The Conditions of Use do not request consumers' consent to disclose PII.

52.    Even if the Conditions of Use did include such a request, it would not satisfy the VPPA's form requirement since the request would not be separate from other terms and conditions contained in the Conditions of Use.

53.    The Conditions of Use do not include an opt-out provision at all, much less a clear and conspicuous opt-out provision for disclosure of PII.

54.    If a user clicks on "Privacy Notice," the consumer is directed to another lengthy page of fine print.[22]

55.    The Privacy Notice does not request consumers' consent to disclose PII.

56.    Even if the Privacy Notice did include such a request, it would not satisfy the VPPA's form requirement since the request would not be separate from other terms and conditions contained in the Privacy Notice.

57.    The Privacy Notice itself does not include an opt-out provision. Instead, if privacy-conscious consumers want to limit the information they provide Amazon entities to protect their privacy, they are warned that—if they do not provide certain information to Amazon—they "might not be able to take advantage of many of our Amazon Services."

58.    Additionally, buried in the 3,624-word Privacy Notice's fine print, there is a hyperlink to the Privacy Choices page, which deals with cross-text behavior ads vis-à-vis third parties. This

---

[21] Conditions of Use, https://www.amazon.com/gp/help/customer/display.html?ref=ap_register_notificatio n_condition_of_use?ie=UTF8&nodeId=508088 (last updated September 14, 2022). The Conditions of Use also contain a link to the same Privacy Notice that are displayed on the initial account-creation page.

[22] Privacy Notice, https://www.amazon.com/gp/help/customer/display.html?ref=ap_register_notification_ privacy_notice?ie=UTF8&nodeId=468496 (last updated August 11, 2023). The Privacy Notice also contains a link to the same Conditions of Use that are displayed on the initial account-creation page.

link is not clear and conspicuous. Instead, it is hyperlinked approximately halfway through the Privacy Notice.

59.     In addition to Amazon Services admitting that it discloses data, it also admits that the disclosures are for **prohibited purposes**.

60.     The Privacy Notice declares that Amazon entities "collect your personal information" and tells consumers that this collection includes three, broad categories of data—(1) provided information (*i.e.*, information consumers provide to Amazon),[23] (2) automatic information (*i.e.*, information Amazon automatically gathers, such as information about your interaction with content);[24] and (3) information from other sources (*e.g.*, third party carriers).[25]

---

[23] Examples include: **identifying information such as your name, address, and phone numbers**; **payment information**; **age**; **location information**; **IP address**; people, addresses and phone numbers listed in your Addresses; email addresses of your friends and other people; content of reviews and emails to us; personal description and photograph in your profile; voice recordings from using Alexa; images and videos collected or stored in connection with Amazon Services; information and **documents regarding identity, including Social Security and driver's license numbers**; corporate and **financial information**; **credit history information**; and **device log files and configurations**.

[24] Examples include: the **internet protocol (IP) address** used to connect a consumer's computer to the internet; login, **email address**, and password; **location** of the consumer's device or computer; **content interaction information, such as content downloads, streams, and playback details**, including duration and number of simultaneous streams and downloads, and network details for streaming and download quality, including information about your internet service provider; device metrics; Amazon Services metrics; version and time zone settings; **purchase and content use history**, which is sometimes aggregated with similar information from other customers to create features like Top Sellers; the full Uniform Resource Locator (URL) clickstream to, through, and from Amazon.com websites, including products and content viewed or searched for; page response times, download errors, length of visits to certain pages, and page interaction information (such as scrolling, clicks, and mouse-overs); phone numbers used to call our customer service number; and images or videos when you shop in certain stores; **device identifiers, cookies, and other technologies on devices, applications, and Amazon web pages to collect browsing, usage, or other technical information**.

[25] Examples include: updated delivery and address information from carriers or other third parties, which Amazon uses to correct its records and deliver your next purchase or communication more easily; **account information, purchase or redemption information, and page-view information from some merchants with which Amazon operates co-branded businesses or for which it provides** technical, fulfillment, **advertising, or other services**; **information about your interactions with products and services offered by Amazon subsidiaries**; search results and links, including paid listings; information about internet-connected devices and services linked with Alexa; **and credit history information from credit bureaus**, which we use to help prevent and detect fraud and **to offer certain credit** or financial services to some customers.

---

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

14

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

61.   The Privacy Notice also states that Defendants "use 'cookies' and other unique identifiers, and [. . .] obtain certain types of information when your web browser or device accesses Amazon Services and other content served by or on behalf of Amazon on other websites . . . ."

62.   Finally, the Privacy Notice states that Defendants use consumers' personal information for a list of reasons. Some of these reasons include purposes that deal with debt collection, order fulfillment, or request processing (*e.g.*, "We use your personal information to take and handle orders, deliver products and services, process payments, and communicate with you about orders, products and services").[26] In another section, the Privacy Notice also indicates that the data could be disclosed as part of a transfer of ownership ("Also, in the unlikely event that Amazon.com, Inc. or substantially all of its assets are acquired, customer information will of course be one of the transferred assets.").

63.   However, many of the listed purposes do not fall within debt collection, order fulfillment, request processing, or transfer of ownership. These include, *inter alia*, using personal information to communicate about promotional offers, using personal information to assess and manage credit risks, and using personal information for targeted ads.[27]

64.   Consumers who sign up for an Amazon Prime account are also told in fine print that "[b]y signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions," which are hyperlinked.

---

[26] The list is not an exhaustive list. The section merely states that "[t]hese purposes include"—suggesting that the list is illustrative and that there are even more purposes for which the data is used beyond those itemized in the list.

[27] The Privacy Notice itself states: "We do not use information that personally identifies you to display interest-based ads. To learn more, please read our Interest-Based Ads notice." But when you follow that link, Defendants instead state that they "do not use information which on its own identifies you, such as name . . . ." The Privacy Notice disclaimer makes it sound like you cannot be personally identified at all with the information Defendants use for targeted ads, but the reality—as explained in the Internet-Based Ads notice—is that the aggregation of information that Defendants use *can* identify you.

65.    Consumers are neither required to check a box indicating that they have agreed to the Amazon Prime Terms and Conditions, nor required to scroll through the text of the Amazon Prime Terms and Conditions before proceeding.

66.    Only by clicking on the hyperlink are consumers directed to the Amazon Prime Terms and Conditions Page, where they are informed that "If you sign up for a Prime membership, you accept these terms, conditions, limitations and requirements," listing a hyperlink to the Amazon Prime Video Terms of Use, among hyperlinks to the terms of use for other Amazon services.[28]

67.    The Amazon Prime Video Terms of Use ("Video Terms of Use") state that the agreement for video rental services is between the consumer and the "entity providing Amazon Prime Video Service" to the consumer.[29] The entity providing Amazon Prime Video Service in the United States is Amazon Services.

68.    The Video Terms of Use also state that in addition to the terms governing a specific provider, a separate Privacy Notice, Conditions of Use, and Amazon Prime Video Usage Rules may be applicable to the use of the service, along with "any rules or usage provisions specified on any product detail page or on any help or other informational page for the Amazon Prime Video service."[30]

69.    The Video Terms of Use page does not explicitly or clearly disclose that PII related to video usage is disclosed to third parties.

70.    Instead—buried in section 4(l), or twenty-two paragraphs in—it vaguely states that "[w]hile viewing certain Channels and Sports and Live content, Amazon **may** provide information

---

[28] Amazon Prime Terms and Conditions, https://www.amazon.com/gp/help/customer/display.html?nodeId=G2B9L3YR7LR8J4XP (last updated May 11, 2021).

[29] Amazon Prime Video Terms of Use, https://www.primevideo.com/help?nodeId=202095490 (last updated October 19, 2023).

[30] *Id.*

about your viewing behavior to third parties for purposes of audience measurement and market research" and contains a hyperlink for further information.[31]

71.     The hyperlink identifies Nielsen as a third party and states that information about consumers' viewing behavior may be shared with Nielsen when consumers watch AMC+, Paramount+, and Thursday Night Football.[32] The link to this "disclosure" is buried at the end of a section titled "Digital Content" in the Video Terms of Use and is not in a "form distinct and separate from any form setting forth other legal or financial obligations of the consumer" as required under the VPPA.

72.     This "disclosure" only applies to one third party, only includes three discrete items, and does not include any explicit disclosures or information about video rental history.

73.     Nielsen's own Digital measurement privacy statement—accessed via yet another separate link—vaguely says that it "**generally** do[es] not (and cannot) identify, or attempt to identify, the individuals about whom we collect content measurement data."[33]

74.     The only other mention of any potential sharing of PII related to video services in the Video Terms of Use is found under a section titled "Software," which states that "We **may** provide certain information regarding your subscription status and use of Digital Content, including viewing history, to video content providers, such as third parties offering subscription services through Prime Video Channels. We will provide this information in a manner that is not identifiable to you (unless you authorize sharing identifiable information with a specific video content provider)."[34]

---

[31] *Id.* (emphasis added).

[32] What Are Nielsen Viewing measurements? https://www.amazon.com/gp/help/customer/display.html?nodeId=202207330&view-type=content-only (last accessed February 29, 2024).

[33] Digital measurement privacy statement, https://www.nielsen.com/legal/privacy-principles/digital-measurement-privacy-statement/?lang=en-us (last accessed February 29, 2024) (emphasis added).

[34] Amazon Prime Video Terms of Use, at section 5(b), https://www.primevideo.com/help?nodeId=202095490&pop-up=1 (last updated October 19, 2023) (emphasis added).

---

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

75.     The Amazon Prime Video Usage Rules, which are hyperlinked on the Video Terms of Use page, fail to disclose that PII related to video usage is shared with third parties.[35]

76.     In short, not only are these "disclosures" regarding the sharing of consumers' PII-related video usage with third parties vague and incomplete, but they are also not distinct and separate from the rest of the Video Terms of Use and are instead buried in a scattershot fashion throughout. This is a clear violation of the VPPA's strict requirements.

77.     The Amazon Prime Video Service Provider Information and Applicable Terms and Policies, are also hyperlinked on the Video Terms of Use page. Under a "Applicable Terms and Legal Notices" Subheading, there are additional links leading back to the Amazon Prime Video Usage Rules page, the Video Terms of Use Page, along with the Conditions of Use page, the Privacy Notice page, an Internet-Based ads page, and a Twitch Terms of Service Page.[36]

78.     Notably, users who sign up for a regular Amazon account (*i.e.*, not a Prime account) are only ever presented with Amazon's Conditions of Use and Privacy Notice, as described above. However, once logged in to a regular Amazon account, users can access Prime Video and rent, purchase, or watch FreeVee or "first episode free" videos without seeing or agreeing to any other disclosures.

79.     Users with regular Amazon accounts are never asked to acknowledge or are even directed to the Video Terms of Use before accessing Amazon Prime Video content.

---

[35]  Amazon Prime Video Usage Rules, https://www.primevideo.com/help?nodeId=202095500 (last accessed February 29, 2024).

[36]  Amazon Prime Video Service Provider Information and Applicable Terms and Policies, https://www.primevideo.com/help?nodeId=202064890 (last accessed February 29, 2024).

**C.    The only opt-out provisions that could be related to the VPPA are neither clear nor conspicuous and do not allow a consumer to opt out of disclosures to co-branded subsidiaries.**

80.    The Amazon.com Privacy Notice Page, under a section titled "What Choices do I Have?", states that "You may adjust your personalized advertising preferences by visiting [the Privacy Choices page]" with an accompanying hyperlink.[37]

81.    The Privacy Choices page does not contain an opt-out provision as to Amazon affiliates and is not clear and conspicuous.

82.    Instead—assuming consumers are even able to find this page—they are only permitted to opt-out of ads on non-Amazon affiliated websites. As such, the Privacy Choices page does not comply with the VPPA's opt-out requirements. Further, the opt-out option for unrelated third parties is not clear and conspicuous, so it does not comply either.

83.    The Privacy Choices page tells consumers that (1) Amazon is already disclosing consumers' data to other Amazon-related entities; (2) Amazon is already using consumers' data from different Amazon entities to target consumers with advertisements; and (3) Amazon will continue these practices even if consumers opt-out of cross-context behavioral ads ("We'll continue to share your data with our co-branded subsidiaries. We'll also continue to show you ads based on your activity on Amazon's sites and apps and those of our co-branded subsidiaries.").

84.    On the Privacy Choices page there is an option to "Allow cross-context behavioral ads" and there is an option to opt-out.[38]

---

[37] Privacy Notice, https://www.amazon.com/gp/help/customer/display.html/ref=ap_register_notification_privacy_notice?ie=UTF8&nodeId=468496 (last updated August 11, 2023).

[38] Privacy Choices,  https://www.amazon.com/privacyprefs?ref_=footer_iba (last accessed February 29, 2024).

85.     Cross-context behavioral ads use data from one company's site or app to advertise to you on a different company's site or app.

86.     If a consumer opts out, Amazon states that it will not "[u]se information about your use of our store and services to deliver ads to you off of Amazon's own properties."[39]

87.     However, Amazon states that it will "continue to share your data with our co-branded subsidiaries" and will "continue to show you ads based on your activity on Amazon's sites and apps and those of our co-branded subsidiaries."[40] There is no opt-out provision to prevent inter-affiliate disclosure of a consumer's PII.

88.     "Co-branded subsidiaries" is not a defined term on either the Privacy Choices page or the preceding Amazon.com Privacy Notice Page.

89.     The "Advertising Privacy and Preferences" page[41] follows this same pattern, allowing consumers to opt-out from targeted ads on unrelated websites, but not on Amazon's own websites.[42] Like the Privacy Choices page, the "Advertising Privacy and Preferences" page does not satisfy the clear and conspicuous requirement. In other words, is it impossible for consumers to opt out of having their data shared with Amazon Services' affiliates and the limited opt-out options that do exist do not comply with the VPPA's strict mandate that the opt-out provision be clear and conspicuous.

### D.     Plaintiffs

90.     Beagle has an Amazon account and has rented videos through that account.

---

[39] *Id.*

[40] *Id.*

[41] Notably, it is difficult for a user to access this page, as they must first navigate to the Interest-Based Ads page via a hyperlink from the Privacy Notice or Privacy Choices page, only to find and click another hyperlink to access their "Advertising Preferences."

[42] Advertising Privacy and Preferences, https://www.amazon.com/adprefs (last accessed February 29, 2024).

91.     Beagle has also registered for access to Paramount+ and Noggin through her Amazon Prime Video account.

92.     As a United States resident, Beagle contracted with Amazon Services to access Amazon Prime Video.

93.     Beagle has purchased or rented ten items from Amazon Prime Video and has streamed additional video content. Her purchases and rentals include:

| Content Name | Type of Purchase | Date Purchase | Price |
|---|---|---|---|
| *Rudolph the Red-Nosed Reindeer* | Buy | November 26, 2021 | $9.99 |
| *Band of Brothers* | Buy | November 12, 2021 | $14.99 |
| *The Lord of the Rings: The Fellowship of the Ring (Extended Edition)* | Buy | May 25, 2023 | $14.99 |
| *The Lord of the Rings (1978)* | Rent | June 6, 2023 | $3.99 |
| *Steve and Maggie – Christmas Special (Vol. 12)* | Rent | July 7, 2023 | $1.99 |
| *The Angry Birds Movie* | Rent | September 11, 2023 | $3.99 |
| *Pinkfong! Baby Shark & Halloween Songs - Halloween Monster Tree* | Buy | November 21, 2023 | $1.99 |
| *Total Recall* | Buy | December 10, 2023 | $9.99 |
| *Frosty the Snowman* | Buy | December 11, 2023 | $7.99 |
| *Gremlins* | Rent | January 16, 2024 | $3.99 |
| *Star Trek II: The Wrath of Khan* | Rent | February 5, 2024 | $3.99 |

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

21

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

94.     When Beagle purchased and/or rented these videos, Amazon Services collected the content viewed—down to the precise number of seconds watched—along with the name, address, credit card information, and other identifying information for Beagle.

95.     Some of her rentals have also long-since expired, including, for example, *The Lord of the Rings (1978)* (June 6, 2023). Most video rentals through Amazon Prime Video are for 30-day rental periods with a 48-hour watch window once the film is started—including *The Lord of the Rings (1978)*. Beagle has already completed payment for her rentals. Her PII regarding this old rental data is no longer necessary for the purposes for which it was collected. She does not have any outstanding requests to view this information, and upon information and belief, there are no pending requests or orders for access for this information for other purposes set forth under the VPPA, such as requests pursuant to a court order or law enforcement agency. As such, her PII related to these rentals should have been destroyed months ago (in the case of *The Lord of the Rings (1978)*, approximately August 5, 2023, at latest). Nonetheless, Amazon Services continues to store this improperly-collected PII.

96.     Amazon Services subsequently disclosed that information to Amazon Inc. by providing Amazon Inc. with direct access to Amazon Services' database with information on Beagle, including access to a trove of Beagle's data, including the titles of videos watched, playback start dates and times, playback end dates and times, whether it was a purchase or rental history, billing address, ISP information, and location information.

97.     Amazon Services has Beagle's PII going back to November 16, 2019, but upon information and belief there are no qualifying, pending requests or orders for access to that information. Even though those orders are long-since completed, Amazon Services has not destroyed that data.

98.     Furthermore, Beagle anticipates buying or renting additional video content in the future, but would like to do so subject to the opt-out provision she is entitled to under the VPPA.

99.     Guerrero has an Amazon Prime account and has purchased, rented, and streamed videos through that account.

100.    As a United States resident, Guerrero contracted with Amazon Services to access Amazon Prime Video.

101.    Guerrero has purchased, rented, or streamed approximately 196 items from Amazon Prime Video, including approximately twelve watched or available in the past couple of years alone:

| Content Name | Type of Purchase | Date Purchase | Price |
|---|---|---|---|
| *Jaws* | Rent | November 6, 2022 | $4.32 |
| *Seven (1995)* | Rent | November 5, 2022 | $4.32 |
| *Fargo* | Rent | November 5, 2022 | $4.32 |
| *The Matrix* | Rent | June 19, 2023 | $4.32 |
| *Roadrunner: A Film About Anthony Bourdain* | Rent | June 8, 2023 | $4.32 |
| *Interstellar* | Rent | June 2, 2023 | $4.32 |
| *The Menu* | Rent | May 6, 2023 | $4.32 |
| *Parasite* | Rent | April 30, 2023 | $4.32 |
| *American History X* | Rent | April 30, 2023 | $4.32 |
| *Arrival* | Rent | February 12, 2023 | $4.32 |
| *Forged in Fire Season 8* | Buy | December 17, 2020 | $2.15 |
| *The Nightmare Before Christmas* | Buy | Upon information and belief, October 17, 2016 | $10.81 |

102.    When Guerrero purchased, rented, and streamed the videos, Amazon Services collected the content viewed—down to the precise number of seconds watched—along with the name, address, credit card information, and other identifying information for Guerrero.

103.    Some of his rentals go as far back as 2016 and 2017, including, for example, *SLC Punk* (March 2, 2017). Most video rentals through Amazon Prime Video are for 30-day rental periods with a 48-hour watch window once the film is started—including *SLC Punk*. Guerrero has long since paid for such rentals and his PII is no longer necessary for the purposes for which it was collected in relation to these old video rentals. Guerrero does not have any outstanding requests to view this information, and upon information and belief, there are no pending requests or orders for access to this information for other purposes set forth under the VPPA, such as requests pursuant to a court order or law enforcement agency. As such, his PII related to these rentals should have been destroyed long ago (in the case of *SLC Punk*, approximately April 1, 2017 at latest). Nonetheless, Amazon Services continues to store this improperly-collected PII.

104.    Amazon Services subsequently disclosed that information to Amazon Inc. by providing Amazon Inc. with direct access to Amazon Services' database with information on Guerrero, including access to a trove of Guerrero's data, including the titles of videos watched, playback start dates and times, playback end dates and times, whether it was a purchase or rental history, billing address, ISP information, and location information.

105.    Amazon Services has Guerrero's PII going back to December 13, 2015, but upon information and belief there are no qualifying, pending requests or orders for access to that information. Even though those orders are long-since completed, Amazon Services has not destroyed that data.

106.    Furthermore, Guerrero anticipates buying, renting, and streaming additional video content in the future, but would like to do so subject to the opt-out provision he is entitled to under the VPPA.

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

24

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

## V.    CLASS ACTION ALLEGATIONS

107.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

108.    Plaintiffs bring this action on behalf of themselves and all other similarly-situated persons as a class action pursuant to Federal Rule of Civil Procedure 23.

109.    Plaintiffs seek to represent a class composed of and defined as follows, and all subject to confirmation, clarification, and/or modification based on discovery to be conducted in this action:

> **All persons nationwide who have rented, purchased, or streamed audiovisual content from Amazon Prime within the applicable statute of limitations and as permitted by applicable tolling periods.**[43]

110.    Excluded from the Class are: (1) Defendants, including any entity in which either defendant has a controlling interest, and any of Defendants' legal representatives, officers, directors, employees, assigns, and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

111.    **Numerosity**: While the exact number of Class Members is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants. Even before the pandemic led to unprecedented growth in online video content services, around 26 million people in the United States streamed videos on Amazon Prime.[44] Therefore, the Class Members are so numerous that

---

[43] Hereinafter referred to as "Class Members" or "the Class." Class Period is defined as all video rental, purchase, or streaming within the applicable statute of limitations and any tolling periods.

[44] https://www.reuters.com/article/us-amazon-com-ratings-exclusive/exclusive-amazons-internal-numbers-on-prime-video-revealed-idUSKCN1GR0FX.

the individual joinder of all Class Members is impracticable under Federal Rule of Civil Procedure 23(a)(1).

112.    **Commonality**: There are common questions of law that exist as to all Class Members pursuant to Federal Rule of Civil Procedure 23(a)(2). Because Defendants' Conditions of Use require application of federal law and Washington law, VPPA and Washington consumer protection law governs the claims of all Class Members nationwide. These common legal and factual issues include:

a.   Whether Amazon Services has violated the VPPA through its disclosure of personally identifiable information to other Amazon entities without obtaining Class Members' informed written consent or providing a clear opt-out provision;

b.   Whether Amazon Services has violated the VPPA through its disclosure of personally identifiable information to third-party entities conducting audience measurement analysis without obtaining Class Members' informed written consent or providing a clear opt-out provision;

c.   Whether Amazon Services and Amazon Inc. have violated the WCPA by engaging in unfair, or in the alternative, deceptive practices through their failure to timely destroy consumers' personally identifiable information;

d.   Whether Amazon Services and Amazon Inc. have violated the WCPA by engaging in unfair, or in the alternative, deceptive practices by inducing individuals to pay for video content services by representing greater privacy protections than actually exist;

e.   Whether Amazon Services and Amazon Inc. have invaded the privacy rights of consumers and are liable for nominal damages; and

f.  Whether Amazon Services and Amazon Inc. should be enjoined from making unfair and deceptive statements regarding consumers' privacy in the future.

113.  **Typicality**: Plaintiffs' claims are typical of the claims of the Class Members whom they seek to represent under Federal Rule of Civil Procedure Rule 23(a)(3) because Plaintiffs and each Class Member purchased, rented, and/or subscribed to video content through Amazon Prime; because Class Members seek the same relief under the VPPA and WCPA; and because Class Members seek the same injunctive relief and nominal damages. Plaintiffs and Class Members were induced to purchase Amazon Prime content based on Defendants' unfair, or in the alternative, deceptive practices regarding Defendants' privacy policies. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class Members.

114.  **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class Members. Plaintiffs do not have any interest which might cause them to not vigorously pursue this action. There are no conflicts between Plaintiffs and the unnamed Class Members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. Therefore, the interests of the Class Members will be fairly and adequately protected.

115.  Further, Plaintiffs have retained competent counsel, including counsel experienced in complex class action litigation, including consumer protection and privacy cases. Class counsel have experience in complex litigation and have the financial and legal resources to meet the costs and legal issues associated with this type of litigation.

116.  A class action is the superior method for the fair and efficient adjudication of this controversy pursuant to Federal Rule of Civil Procedure 23(b). Prosecuting separate actions on behalf of individual class members would create a risk of inconsistent adjudications while

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

27

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

adjudication of issues in one individual matter will be dispositive of those issues in all individual cases. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.

117.    Additionally, questions of law and fact common to Class Members predominate here. There are few difficulties in managing this case as a class action, whereas there are many difficulties associated with proceeding on an individual basis. It would be virtually impossible for individual Class Members to effectively redress the wrongs done to them. Even if the Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on Defendants' extensive consumer files on each claimant.

## VI.    CAUSES OF ACTION

### A.    Amazon Services' Violations of the Video Privacy Protection Act, 18 U.S.C. § 2710

118.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

119.    Plaintiffs bring this count under the VPPA, individually and on behalf of the other members of the Class, against Defendant Amazon Services.

120.    Plaintiffs and the Class Members are "consumers" within the meaning of the VPPA because they are renters, purchases, or subscribers of goods or services from Amazon Services. 18 U.S.C. § 2710(a)(1).

121.    Amazon Services is a video tape service provider under the VPPA because it is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

122.    Amazon Services gathers and shares consumers' PII with Amazon Inc. and other affiliates. This information includes "content interaction information, such as content downloads, streams, and playback details, including duration and number of simultaneous streams and downloads, and network details for streaming and download quality, including information about [consumers'] internet service provider."[45]

123.    Amazon Services also discloses this information to third parties both under the guise of "audience measurement" and "cross-context behavioral ads."

124.    Amazon Services chose and continues to choose to disclose consumers' PII without the informed, written consent mandated by 18 U.S.C. § 2710(b)(2). The limited, written "disclosures" that Amazon Services provides do not comply with the time limits set forth by VPPA and do not allow the required case-by-case withdrawal or withdrawal on an ongoing basis. Any "disclosures" that Amazon Services shares consumers' PII related to video usage with third parties are obscure and, importantly, not separate and distinct from the rest of the fine print. Procedurally, the opt-out provision—to the extent it exists—is not provided in a clear and conspicuous manner.

---

[45] Amazon.com Privacy Notice, *supra* note 22.

125. Liquidated damages, punitive damages, reasonable attorneys' fees and litigation costs, and equitable relief should be awarded for Amazon Services' violations of the Video Privacy Protection Act under 18 U.S.C. § 2710(c)(4).

**B.    Amazon Services' and Amazon Inc.'s Violation of the Washington Consumer Protection Act, RCW 19.86 *et seq*. – Non-Per Se Unfair, or in the Alternative, Deceptive Business Practices**

126. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

127. Plaintiffs bring this count under Washington State's Consumer Protection Act, individually and on behalf of the other members of the Class, against Defendants.

128. Defendants are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.101(1), and they conduct "trade" and "commerce" within the meaning of the Washington Consumer Protection Act, RCW 19.86.101(2).

129. Plaintiffs and other Class Members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.101(1).

130. Amazon Services has a pattern and practice of failing to properly obtain informed, written consent under the VPPA for purposes outside VPPA's narrow exceptions, failing to provide compliant opt-outs for consumers, and failing to destroy old records. These actions constitute unfair, or in the alternative, deceptive acts in trade or commerce in violation of the Washington Consumer Protection Act, RCW 19.86 *et seq*.

131. Amazon Inc. knowingly participates in and oversees these patterns and practices, including by sharing the same fine print "disclosures," and upon information and belief instructing its subsidiary Amazon Services to share access to the PII database for prohibited purposes. These

1    actions constitute unfair, or in the alternative, deceptive acts in trade or commerce in violation of

2    the Washington Consumer Protection Act, RCW 19.86 *et seq*.

3    132.    Due to the lack of informed consent, Plaintiffs' and Class Members' PII was unlawfully

4    obtained.

5    133.    These actions violate the Washington Consumer Protection Act because they violate public

6    policy as it has been established by, *inter alia*, Congressional statutes such as the VPPA.

7    134.    These actions also unfairly and/or deceptively invade consumers' right to their property,

8    including their privacy interests. Washington State has repeatedly emphasized the importance of

9    privacy rights, including enshrining privacy rights in the Washington State Constitution Article 1,

10   Section 7: "No person shall be disturbed in his private affairs, or his home invaded, without

11   authority of law," and also through the common law right of privacy.[46]

12   135.    These violations, as set forth above, are injurious to the public interest and have/had the

13   capacity to injure or deceive other persons and/or the public. It is likely that additional persons

14   have been injured in the same manner as Plaintiffs in this case and, as to the unfair and/or deceptive

15   representations about privacy for Prime Video users, it is likely that additional persons will

16   continue to be injured in the same manner as Plaintiffs.

17   136.    As a direct and proximate result of Defendants' violations of the Washington Consumer

18   Protection Act set forth above, Plaintiffs and Class Members have suffered damages, including

19   damages to their property right to protected privacy, in an amount to be proven at trial.

20   137.    Treble damages, attorneys' fees, and costs are properly awardable for Defendants'

21   violations of the Washington Consumer Protection Act under RCW 19.86.090.

22

23

24   [46] *See State v. Lee,* 135 Wash. 2d 369, 392, 957 P.2d 741 (1998).

---

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

31

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

## VII.   PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

A.     An order certifying the proposed Class and designating Plaintiffs as named representatives of the Class;

B.     Money damages, in the form of stipulated damages of $2,500 per violation from Amazon Services, a video tape service provider, for its violations of VPPA;

C.     Equitable relief;

D.     Nominal damages for invasion of privacy;

E.     Reasonable attorneys' fees and costs;

F.     Pre-judgment and post-judgment interest, as provided by law; and

G.     Such other and further relief as this Court deems just and proper.

TRIAL BY JURY DEMANDED ON ALL COUNTS


DATED:  March 08, 2024          Respectfully submitted,

                                **DUNCAN LAW, PLLC**

                                *s/ Shaquelle M. Duncan*
                                Shaquelle M. Duncan (WA Bar #56701)
                                410 SW 10th Street, Suite 215
                                Renton, WA 98057
                                Telephone: (206) 237-7714
                                Facsimile: (206) 238-1324
                                Email: duncans@duncanlawpllc.com

                                *Counsel for Plaintiffs*

                                and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**BRAGAR EAGEL & SQUIRE, P.C.**
*(Applications for leave to appear*
*pro hac vice are forthcoming)*

Melissa A. Fortunato (CA Bar #319767)
  fortunato@bespc.com
580 California Street, Suite 1200
San Francisco, CA  94104
Telephone: (415) 568-2124
Facsimile: (212) 304-0506

Lawrence P. Eagel (NY Bar #1924067)
  eagel@bespc.com
Casey C. DeReus (LA Bar #37096)
  dereus@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
810 Seventh Avenue, Suite 620
New York, NY 10019
Tel:  (212) 308-5858
Fax: (212) 486-0462

*Counsel for Plaintiffs*

<u>and</u>

**BURNS CHAREST LLP**
*(Applications for leave to appear*
*pro hac vice are forthcoming)*

Amanda K. Klevorn (LA Bar #35193)
Korey A. Nelson (LA Bar #30002)
Laura S. Seggerman (TX Bar #24134116)
365 Canal Street, Suite 1170
New Orleans, LA 70130
T:  (504) 799-2845
F:  (504) 881-1765
E:  aklevorn@burnscharest.com
     knelson@burnscharest.com
     lseggerman@burnscharest.com

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

33

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714

1

Cristina Delise (NY Bar #5442033)
Burns Charest LLP

2

757 Third Avenue, 20th Floor
New York, New York 10017

3

469.904.4550 main
469.663.5940 direct

4

469.444.5002 fax
cdelise@burnscharest.com

5

*Counsel for Plaintiffs*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CLASS ACTION COMPLAINT
No. 2:24-cv-00316

34

Duncan Law, PLLC
451 SW 10th St, Ste. 215
Renton, WA 98057
(206) 237-7714