1

2

3

4

5

The Honorable James L. Robart

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

8

9

10

11

12

13

14

15

| | |
|---|---|
| MEREDITH BEAGLE, JORDAN GUERRERO, and SOFAUNA JOHNSON on Behalf of Themselves and All Others Similarly Situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>AMAZON.COM, INC.<br>and AMAZON.COM SERVICES LLC.<br><br>            Defendants. | No.: 2:24-cv-00316<br><br>**SECOND AMENDED COMPLAINT—CLASS ACTION**<br><br>DEMAND FOR JURY TRIAL |

16

17

18

19

20

21

22

23

24

      Plaintiffs Meredith Beagle ("Beagle"), Jordan Guerrero ("Guerrero"), and Sofauna Johnson ("Johnson" and together with Beagle and Guerrero, "Plaintiffs") individually and on behalf of a class of similarly situated individuals, by and through their undersigned counsel, bring this class action against Defendants Amazon.com, Inc. ("Amazon Inc.") and Amazon.com Services LLC ("Amazon Services") (collectively "Defendants"). Plaintiffs bring claims for violations of the Video Privacy Protection Act ("VPPA"). Johnson also brings claims against Amazon Services for violations of California Civil Code § 1799.3. Plaintiffs allege the following upon information and belief, except as to allegations specifically pertaining to each of their respective claims, which are based on each client's personal knowledge:

## I.    PRELIMINARY STATEMENT

1.    "[P]eople ought to be able to read books and watch films without the whole world knowing."[1] It is important for people to be able to "watch films without the whole world knowing," because disclosure of a consumer's private information allows for weaponization and consumer profiling.

2.    Weaponization of private data allows others to use a consumer's data against the consumer. One example of this is the risk of consumers' private data being disclosed and potentially used against them in the hiring process.[2] Another example involves an angry spouse in a child custody proceeding using video records to argue that the other parent is not fit to have custody.[3] These two examples of weaponization have actually happened, but there are countless other ways this data could be misused to hurt a consumer.

3.    In addition to potential weaponization, this private data can also be used to create and commercialize consumer profiles. Even in the late 1980s, before the internet was popular and when the VPPA was under Senate consideration in committee, Senator Patrick Leahy observed and denounced this growing risk to privacy, stating: "[I]n an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and 6 telephones, all lodged together in computers, it would be relatively easy **at some point** to give a **profile of a person** and tell what they buy in a store, what kind of food they like, what sort of television

---

[1] Joint hearing of the Senate Judiciary Subcommittee on Technology and the Law and the House Judiciary Subcommittee on Courts, Civil Liberties, and the Administration of Justice, 100 Cong. p. 10 (held on August 3, 1988) (Statement of Representative Al McCandless).

[2] The original impetus for the VPPA was the disclosure of United States Supreme Court nominee Judge Robert H. Bork's video rental list.

[3] The Senate Judiciary Committee Report on the VPPA noted one occasion when "the attorney for a woman in a child custody proceeding made an informal request for the records of every film rented by her husband in an effort to show that, based on his viewing habits, he was an unfit father." The Video Privacy Protection Act of 1988 - Report, Mr. Biden, from the Committee on the Judiciary (Oct. 21, 1988).

---

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

programs they watch, who are some of the people they telephone. I think that is wrong. **I think that really is Big Brother, and I think it is something that we have to guard against**."[4]

4.      More than 30 years later, the once-hypothetical risk Senator Leahy identified is now a reality. Defendants have amassed consumer data and built consumer profiles. For example, through its Whole Foods subsidiary, Amazon Inc. knows what kind of foods we like. Through Amazon Echo, Amazon Inc. knows who we call on the phone. And through Amazon Prime Video (operated by Amazon Services), Amazon knows what television programs and movies we watch.

5.      But unlike food and phone calls, thanks to the VPPA, there are limits on what information Amazon Services can legally disclose to Amazon Inc., other affiliates, and third parties based on what we watch. Generally, under the VPPA, a video service provider, such as Amazon Services, cannot disclose personally identifiable information ("PII") of a renter, purchaser, or subscriber of its goods or services.[5] PII includes any information identifying a consumer as having requested or obtained specific video materials or services from a video tape service provider.[6]

6.      As explained herein, Amazon Services discloses PII to its parent company—Amazon Inc.—on a regular basis in violation of the VPPA and California Civil Code § 1799.3. Amazon Services discloses consumers' PII to Amazon for audience measurement purposes, marketing purposes, market research purposes, advertising purposes, and other data collection and analysis purposes. None of these services are in the ordinary course of business as defined by the VPPA or the commercial purposes provision under California law. Upon information and belief, Amazon Services discloses PII to other Amazon affiliates as well.

---

[4] Hearings on Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the United States Before the Senate Committee on the Judiciary, 100th Cong., 1st Sess. 1372, 1374 (Sept. 28, 1987) (emphasis added).

[5] 18 USCS § 2710(b)(1).

[6] 18 USCS § 2710(b)(2)(B)(i).

---

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

7.    Amazon Services also discloses consumers' PII to other non-Amazon affiliated third parties for audience measurement purposes and market research without explicit, separate, and written consent or the opportunity to opt-out.

***Defendants' Conduct Violates the VPPA***

8.    The VPPA provides a handful of exceptions to the prohibition on disclosing PII, such as disclosure to a law enforcement agency pursuant to a warrant; disclosure to anyone with informed, written consent; disclosure to the consumer himself or herself; and disclosure incident to the video tape service provider's ordinary course of business.[7] Two of the exceptions most relevant here are the ordinary course of business exception and the informed, written consent exception. Neither one (nor any of the others) applies to Amazon Services' disclosures to Amazon.

9.    The VPPA narrowly defines "ordinary course of business." It only includes debt collection, order fulfillment, request processing, and transfer of ownership.[8] But, as described herein, Amazon Services discloses PII for other, unauthorized purposes, such as marketing.

10.    The informed consent exception is also subject to specific statutory requirements. It requires a video service provider to obtain the explicit, informed, and written consent of the consumer before or contemporaneously with disclosure of the consumer's PII.

11.    Unlike in food or telecommunications sectors, where "Americans are forced to provide to businesses and others personal information without having any control over where that information goes," the VPPA empowers consumers in the video sector to control their data by regulating when and to whom certain data can be disclosed and for what purposes.[9]

---

[7] 18 USCS § 2710(b)(2).

[8] 18 U.S. Code § 2710(a)(2).

[9] 134 Cong. Rec. S5401 (May 10, 1988) (statement of Senator Paul Simon) (noting when the Senate introduced the VPPA that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes, and dislikes.").

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                    4

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

12.    This informed consent exception has a form requirement, a timing requirement, and an opt-out requirement. These elements work in tandem to make sure consumers have actual knowledge—on the front end—of the specific video privacy rights they are giving away, and it provides them a way to opt-out.

13.    To satisfy the form requirement, informed consent must be presented in "a form distinct and separate from any form setting forth other legal or financial obligations of the consumer."[10]

14.    As one court has explained, "the plain language of the VPPA does indeed require video tape service providers to (1) request consumers' consent to a privacy disclosure that addresses only the use of personally identifiable information connected with video purchases and no other privacy topic, and (2) obtain the act of consent separately from the consumer's agreement to the retailer's terms of use, general privacy policy, and the commercial terms of the purchase."[11]

15.    To satisfy the timing requirement, consent must be obtained either contemporaneously with or in advance of the disclosure sought—not after-the-fact.

16.    Finally, the video service provider must give an opportunity, in a clear and conspicuous manner, for the consumer to withdraw from any disclosure of his or her PII.

17.    Amazon Services—the video service provider for United States Amazon Prime Video consumers—does not comply, and has never complied, with the VPPA's requirements for informed written consent. Amazon Services[12] *repeatedly admits* that Amazon Services shares consumer data with Amazon Services affiliates like Amazon Inc.

---

[10] 18 USCS § 2710(a)(3).

[11] *Cappello v. Walmart Inc.*, No. 18-CV-06678-RS, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019).

[12] Defendants' Conditions of Use and Privacy Notice are vague about which Amazon entities the Conditions of Use and Privacy Notice refer to. For example, the Privacy Notice describes "how Amazon.com and its affiliates (collectively 'Amazon') collect and process your personal information," lumping Amazon Inc. and Amazon Services together for purposes of the Privacy Notice.

18.     Additionally, reports from former Amazon information security professionals have described a data "free-for-all" within the Amazon empire. In other words, there is a free flow of data from Amazon Services to Amazon Inc. These data disclosure practices are more systemic than sending this data through one-off disclosures (such as through encoded pixels). Instead, Amazon Services maintains a virtual "warehouse" of data that it collects from consumers who are unable to opt-out and gives Amazon Inc. access to that database.

19.     Instead of a distinct and separate form governing video PII, Defendants bury all their privacy-related "disclosures" in a maze of hyperlinks and fine print.

20.     Amazon Services also does not provide consumers the opportunity to opt out of disclosing this information to affiliated Amazon entities. Instead, if customers wish to protect their PII from flowing to other Amazon entities, their only option is to forego the use of Amazon Services or risk a drop-off in services provided.

21.     Because of Amazon Services' systematic and repeated violations of the VPPA, Plaintiffs and the other Class Members seek damages and injunctive relief to protect their PII.

22.     Amazon Inc.'s unlawful practices include its knowing participation in receiving this ill-gotten information and using it to the detriment of its consumers. Amazon Inc. also creates and oversees the confusing maze of fine print used by its subsidiaries, including Amazon Services.

***Amazon Services' Conduct Violates Cal. Civ. Code § 1799.3(6)***

23.     Finally, Amazon Services' practices also violate California Civil Code § 1799.3. During the same time period that Congress enacted the VPPA, the California Legislature passed Cal. Civ. Code § 1799.3 into law to restrict the disclosure of video sale or rental records and protect Californian's privacy. 1988 Cal. Legis. Serv. 1050 (West) ("Existing law does not generally restrict the disclosure by persons providing video cassette sales or rental services of records

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                                                    6

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

prepared or maintained by those persons, although the California Constitution specifies privacy as one of the inalienable rights of all people in the state.").[13]

24.     California Civil Code § 1799.3 bars video service providers from disclosing any personal information, or the contents of any record, to any third-party, without written consent. Amazon Services discloses consumers' PII to Amazon Inc. and non-Amazon affiliated third parties for audience measurement purposes, marketing purposes, market research purposes, advertising purposes, and other data collection and analysis purposes. None of these services fall within the ordinary course of business exception to § 1799.3, which, only permits the disclosure of names and addresses for commercial purposes. See Cal. Civ. Code § 1799.3(6). Nor does Amazon Services obtain consumers' express written consent for such disclosures.

25.     In an effort to preserve Californian's right to privacy, Section 1799.3(a) provides that "[n]o person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

26.     While Section 1799.3 is similar to the VPPA, it provides far narrower exceptions to disclosure. Specifically, Section 1799.3 contains no exception for disclosure made in the ordinary course of business. Instead, it exempts "the disclosure of names and addresses only for commercial purposes." Cal. Civ. Code § 1799.3(6).

27.     Moreover, as described herein, Amazon Services does not comply with Section 1799.3's written consent requirement. Indeed, Amazon Services repeatedly admits that Amazon Services shares consumer data with Amazon Services affiliates like Amazon Inc.

---

[13] Cal. Civ. Code § 1799.3 was amended in 2009 to change "video cassettes" to "video recording."

## II.    PARTIES

28.    Plaintiff Beagle is a citizen of Charles City County in the State of Virginia. She is of the full age of majority.

29.    Plaintiff Guerrero is a citizen of the Parish of Orleans in the State of Louisiana. He is of the full age of majority.

30.    Plaintiff Johnson is citizen of Los Angeles County, California. She is of the full age of majority.

31.    Amazon Inc. is a Delaware corporation with its principal place of business in Seattle, Washington.

32.    Amazon.com Services is a Delaware limited liability company with its principal place of business in Seattle, Washington. Amazon Services is a wholly-owned subsidiary of Amazon Inc.

33.    Because of the central role Amazon Inc., Amazon Services, and other Amazon affiliates play in American society, Defendants' own fine print, news articles, and other sources often simply refer to "Amazon" or "Amazon.com" without specifying which entity or entities are specifically being referenced. In such circumstances, the affiliate is referenced herein simply as "Amazon."

## III.    JURISDICTION AND VENUE

34.    This Court has diversity jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). This complaint states claims on behalf of a national class of consumers who are minimally diverse from Defendants. The amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

35.    This Court also has federal question jurisdiction under 28 U.S.C. § 1331 as this action arises, in part, under a federal statute, the VPPA.

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                     8

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

36.    This Court has personal jurisdiction over Defendants because some of the acts alleged herein were committed in the state of Washington and because Defendants are registered to do business in this state and systematically and continuously conduct business in this state.[14]

37.    Venue is proper in this District under 28 U.S.C. § 1391(b) as to Amazon Inc. and Amazon Services because they (1) are both headquartered in this District; (2) transact business in this District; and (3) transacted business in this District at the time the cause of action arose.

## IV.    GENERAL ALLEGATIONS

### A.    Amazon, Inc. has a well-documented history of providing misleading and incomplete information to consumers about the use, storage, and disclosure of their personal information.

38.    Amazon Inc. is a huge, multinational corporation headquartered in Seattle, Washington. As of January 2024, Amazon Inc. has a market capitalization of $1.630 trillion.

39.    Amazon Inc. has been the subject of consumer protection actions and inquiries. In fact, on June 21, 2023, the Federal Trade Commission ("FTC") filed a lawsuit against Amazon Inc. for violations of the Federal Trade Commission Act and the Restore Online Shoppers' Confidence Act.[15]

40.    In *FTC v. Amazon.com, Inc.*, the FTC addressed specific unfair and deceptive practices by Amazon Inc. Specifically, the FTC explained that Prime Video is a distinct product from Prime, since Prime Video is a subscription-based video streaming service. As alleged by the FTC, although it is possible to sign up for Prime Video alone, it is difficult to do so. In the ongoing lawsuit, the FTC alleges that Amazon Inc.'s dark patterns trick consumers into signing up for Prime instead of Prime Video, which would be a lower-cost option.

---

[14] Defendants have also explicitly chosen to avail themselves of the laws of Washington. Defendants' Conditions of Use contain a choice of law agreement that states that "applicable federal law, and the laws of the state of Washington" govern all consumer disputes with Defendants.

[15] *Federal Trade Commission v. Amazon.com, Inc.*, 2:23-cv-00932 (W.D. Wash. 2023).

41.     Once consumers have signed up, the FTC further alleges that Amazon Inc. knowingly complicates the cancellation process for Prime subscribers who sought to end their membership. As explained by the FTC, up until recently, "the primary purpose of the Prime cancellation process was not to enable subscribers to cancel, but rather to thwart them. Fittingly, Amazon named that process "Iliad," which refers to Homer's epic about the long, arduous Trojan War. Amazon designed the Iliad cancellation process ("Iliad Flow") to be labyrinthine, and Amazon and its leadership slowed or rejected user experience changes that would have made Iliad simpler for consumers because those changes adversely affected Amazon's bottom line. As with nonconsensual enrollment, the Iliad Flow's complexity resulted from Amazon's use of dark patterns—manipulative design elements that trick users into making decisions they would not otherwise have made."[16]

42.     Once consumers are in the Amazon system, Defendants amass data profiles for consumers with little regard for protecting their privacy. Former Amazon chief information security officer Gary Gagnon described Amazon's internal access policies for customer information as a "free-for-all" among Amazon's global workforce.[17]

43.     One former, U.S.-based information security professional from Amazon explained that, "Amazon has grown so fast, it doesn't know what it owns . . . They don't know where their data is at . . . ."[18]

44.     One former employee stated: "We found hundreds of thousands of accounts where the employee is no longer there but they still have system access."[19]

---

[16] *Id.* at 3.

[17] https://revealnews.org/article/inside-amazons-failures-to-protect-your-data-internal-voyeurs-bribery-schemes-and-backdoor-access/.

[18] https://www.politico.eu/article/data-at-risk-amazon-security-threat/.

[19] *Id.*

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

45.    *A Look Behind the Screens: Examining the Data Practices of Social Media and Video Streaming Services* (hereinafter "*Behind the Screens* Report")—a recent FTC Staff report—sheds further light on Amazon Inc. and its affiliates' data practices.  The *Behind the Screens* Report summarizes the FTC's findings arising from 6(b) orders it issued to nine companies, including Amazon Inc. and its subsidiary, Twitch.[20]  The report states:

> **The Status Quo Is Unacceptable**: The amount of data collected by large tech companies is simply staggering. They track what we read, what websites we visit, whether we are married and have children, our educational level and income bracket, our location, our purchasing habits, our personal interests, and in some cases even our health conditions and religious faith. They track what we do on and off their platforms, often combining their own information with enormous data sets purchased through the largely unregulated consumer data market. And large firms are increasingly relying on hidden pixels and similar technologies – embedded on other websites – to track our behavior down to each click. In fact, the Companies collected so much data that in response to the [FTC]'s questions, they often could not even identify all the data points they collected or all of the third parties they shared that data with.

46.    The *Behind the Screens* Report also discusses what companies, including Amazon Inc. and its affiliate Twitch, shared or disclosed. In response to an order requiring the companies to "[i]dentify those entities and [d]escribe in [d]etail the types of Personal Information and purposes for such sharing . . . ." the FTC reported that, "[n]o [c]ompany provided a comprehensive list of all third-party entities that they shared Personal Information with. Some Companies provided illustrative examples, whereas others claimed that this request was impossible.  A few Companies provided only the names of third-party entities with which the Company had entered a formal contract, thus omitting third parties that the Companies shared with that were not subject to contracts.  Altogether, the Companies' responses lacked clear explanations or specificity regarding the exact use cases for sharing with each entity. This lack of transparency could indicate an

---

[20] https://www.ftc.gov/system/files/ftc_gov/pdf/Social-Media-6b-Report-9-11-2024.pdf.

1    inability or unwillingness to account for the extent of those practices because consumers' data was

2    shared so broadly.[21]

3    47.    The *Behind the Screens* report stated that "Most [c]ompanies acknowledged that they

4    shared users' Personal Information with affiliates and other company-branded entities."

5    48.    Despite Amazon Inc.'s proclamations of the separateness of its entities when it suits its

6    purposes and its insistence that it values consumer privacy, Amazon Services uses similar patterns

7    of misdirection, confusing language, and fine print to minimize the privacy violations it and its

8    affiliates participate in.

9        **B.    Amazon Services' fine print does not satisfy the VPPA's strict statutory
         requirements regarding the disclosure of consumers' PII-related video usage
10        history.**

11    49.    Amazon Services' "disclosures" pertaining to the use of consumer information and

12    consumer privacy are intentionally scattered throughout a series of online pages that must be

13    navigated via a maze of misleading hyperlinks. The "disclosures" acknowledge that Amazon

14    Services can and is sharing PII-related video usage history with both Amazon affiliates and

15    unaffiliated third parties, but not in the separate, distinct format mandated by the VPPA and not

16    with a clear notification of the right to opt-out.

17    50.    Examples of Amazon Services' own acknowledgment of disclosures include admissions

18    in the Privacy Notice ("We share customers' personal information . . . with subsidiaries

19

20    [21] As used in the *Behind the Screens* Report, "Personal Information" means information about a specific individual or
      Device, including: (1) first and last name; (2) home or other physical address, including street name and name of city
21    or town, or other information about the location of the individual, including but not limited to location from cellular
      tower information, fine or coarse location, or GPS coordinates; (3) email address or other online contact information,
22    such as an instant messaging user identifier or screen name; (4) telephone number; (5) a persistent identifier, such as
      a customer number held in a "cookie," a static Internet Protocol ("IP") address, a device identifier, a device fingerprint,
      a hashed identifier, or a processor serial number; (6) nonpublic Communications and content, including, but not limited
      to, e-mail, text messages, contacts, photos, videos, audio, or other digital images or audio content; (7) internet
23    browsing history, search history, or list of URLs visited; (8) video, audio, cable, or TV viewing history; (9) biometric
      data; (10) health or medical information; (11) demographic information; or (12) any other information associated with
24    that User or Device.

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

Amazon.com, Inc. controls"); on the "Your Ads Privacy Choices" page ("Privacy Choices page") ("If you opt out [of cross context behavioral ads],[w]e'll continue to share your data with our co-branded subsidiaries. We'll also continue to show you ads based on your activity on Amazon's sites and apps and those of our co-branded subsidiaries."); and on the "Advertising Privacy and Preferences" page ("If you choose not to be shown interest-based ads above, we won't: Use information about your use of our store and services to deliver ads to you **off of Amazon's own properties"** [but, by implication, *will* continue to target ads on Amazon's own properties]) (original emphasis removed, current emphasis added).

51.   And while there is an inadequate opt-out for some information as to unaffiliated third parties, there is no opt-out at all for Amazon affiliates. Instead, Amazon Services' maze of fine print says that consumer data will be shared among its affiliates.

52.   As described below, even though Defendants' fine print admits that Defendants collect and disclose consumers' data, Defendants do not obtain consumers' consent nor provide a clear and conspicuous opt-out.

53.   The registration process to create a new Amazon or Amazon Prime Account—both of which include at least some level of Prime Video access—instead presents consumers with a maze of hyperlinks and fine print. First, a consumer is prompted to fill in his or her name, email, and password. There is no specific reference to video privacy disclosure, and consumers are not presented with an opt-out option or any other requests for consent relating to their video records. Instead, in fine print at the bottom, consumers are simply told, "By creating an account, you agree to Amazon's Conditions of Use and Privacy Notice." That disclaimer contains hyperlinks to the Conditions of Use and Privacy Notice.

54.    Consumers are not required to check a box indicating that they have agreed to the Conditions of Use and Privacy Notice before proceeding.

55.    Consumers are not required to scroll through the text of the Conditions of Use and Privacy Notice before proceeding.

56.    Neither the Conditions of Use nor the Privacy Notice contain a request for consent or an opt-out provision.

57.    If a consumer clicks on "Conditions of Use," the consumer is directed to a lengthy page of fine print.[22]

58.    The Conditions of Use do not request consumers' consent to disclose PII.

59.    Even if the Conditions of Use did include such a request, it would not satisfy the VPPA's

---

[22] Conditions of Use, https://www.amazon.com/gp/help/customer/display.html/ref=ap_register_notification_condition_of_use?ie=UTF8&nodeId=508088 (last updated September 14, 2022). The Conditions of Use also contain a link to the same Privacy Notice that are displayed on the initial account-creation page.

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                    14

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

form requirement since the request would not be separate from other terms and conditions contained in the Conditions of Use.

60.     The Conditions of Use do not include an opt-out provision at all, much less a clear and conspicuous opt-out provision for disclosure of PII.

61.     If a user clicks on "Privacy Notice," the consumer is directed to another lengthy page of fine print.[23]

62.     The Privacy Notice does not request consumers' consent to disclose PII.

63.     Even if the Privacy Notice did include such a request, it would not satisfy the VPPA's form requirement since the request would not be separate from other terms and conditions contained in the Privacy Notice.

64.     The Privacy Notice itself does not include an opt-out provision. Instead, if privacy-conscious consumers want to limit the information they provide Amazon entities to protect their privacy, they are warned that—if they do not provide certain information to Amazon—they "might not be able to take advantage of many of our Amazon Services."

65.     Additionally, buried in the 3,634-word Privacy Notice's fine print, there is a hyperlink to the Privacy Choices page, which deals with cross-text behavior ads vis-à-vis third parties. This link is not clear and conspicuous. Instead, it is hyperlinked approximately halfway through the Privacy Notice.

66.     In addition to Amazon Services admitting that it discloses data, it also admits that the disclosures are for **prohibited purposes**.

67.     The Privacy Notice declares that Amazon entities "collect your personal information" and

---

[23] Privacy Notice, https://www.amazon.com/gp/help/customer/display.html/ref=ap_register_notification_privacy_notice?ie=UTF8&nodeId=468496 (last updated March 31, 2024).  The Privacy Notice also contains a link to the same Conditions of Use that are displayed on the initial account-creation page.

tells consumers that this collection includes three broad categories of data—(1) provided information (*i.e.*, information consumers provide to Amazon),[24] (2) automatic information (*i.e.*, information Amazon automatically gathers, such as information about your interaction with content);[25] and (3) information from other sources (*e.g.*, third party carriers).[26]

68.    The Privacy Notice also states that Defendants "use 'cookies' and other unique identifiers, and [. . .] obtain certain types of information when your web browser or device accesses Amazon Services and other content served by or on behalf of Amazon on other websites . . . ."

69.    Finally, the Privacy Notice states that Defendants use consumers' personal information for a list of reasons. Some of these reasons include purposes that deal with debt collection, order fulfillment, or request processing (*e.g.*, "We use your personal information to take and handle orders, deliver products and services, process payments, and communicate with you about orders,

---

[24] Examples include: **identifying information such as your name, address, and phone numbers**; **payment information**; **age**; **location information**; **IP address**; people, addresses and phone numbers listed in your Addresses; email addresses of your friends and other people; content of reviews and emails to us; personal description and photograph in your profile; voice recordings from using Alexa; images and videos collected or stored in connection with Amazon Services; information and **documents regarding identity, including Social Security and driver's license numbers**; corporate and **financial information**; **credit history information**; and **device log files and configurations**.

[25] Examples include: the **internet protocol (IP) address** used to connect a consumer's computer to the internet; login, **email address**, and password; **location** of the consumer's device or computer; **content interaction information, such as content downloads, streams, and playback details**, including duration and number of simultaneous streams and downloads, and network details for streaming and download quality, including information about your internet service provider; device metrics; Amazon Services metrics; version and time zone settings; **purchase and content use history**, which is sometimes aggregated with similar information from other customers to create features like Top Sellers; the full Uniform Resource Locator (URL) clickstream to, through, and from Amazon.com websites, including products and content viewed or searched for; page response times, download errors, length of visits to certain pages, and page interaction information (such as scrolling, clicks, and mouse-overs); phone numbers used to call our customer service number; and images or videos when you shop in certain stores; **device identifiers, cookies, and other technologies on devices, applications, and Amazon web pages to collect browsing, usage, or other technical information**.

[26] Examples include: updated delivery and address information from carriers or other third parties, which Amazon uses to correct its records and deliver your next purchase or communication more easily; **account information, purchase or redemption information, and page-view information from some merchants with which Amazon operates co-branded businesses or for which it provides** technical, fulfillment, **advertising, or other services**; **information about your interactions with products and services offered by Amazon subsidiaries**; search results and links, including paid listings; information about internet-connected devices and services linked with Alexa; **and credit history information from credit bureaus**, which we use to help prevent and detect fraud and **to offer certain credit** or financial services to some customers.

---

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                                16

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

products and services").[27] In another section, the Privacy Notice also indicates that the data could be disclosed as part of a transfer of ownership ("Also, in the unlikely event that Amazon.com, Inc. or substantially all of its assets are acquired, customer information will of course be one of the transferred assets.").

70.     However, many of the listed purposes do not fall within debt collection, order fulfillment, request processing, or transfer of ownership. These include, *inter alia*, using personal information to communicate about promotional offers, using personal information to assess and manage credit risks, and using personal information for targeted ads.[28]

71.     Consumers who sign up for an Amazon Prime account are also told in fine print that "[b]y signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions," which are hyperlinked.

72.     Consumers are neither required to check a box indicating that they have agreed to the Amazon Prime Terms and Conditions, nor required to scroll through the text of the Amazon Prime Terms and Conditions before proceeding.

73.     Only by clicking on the hyperlink are consumers directed to the Amazon Prime Terms and Conditions Page, where they are informed that "If you sign up for a Prime membership, you accept these terms, conditions, limitations and requirements," listing a hyperlink to the Amazon Prime Video Terms of Use, among hyperlinks to the terms of use for other Amazon services.[29]

---

[27] The list is not an exhaustive list. The section merely states that "[t]hese purposes include"—suggesting that the list is illustrative and that there are even more purposes for which the data is used beyond those itemized in the list.

[28] The Privacy Notice itself states: "We do not use information that personally identifies you to display interest-based ads. To learn more, please read our Interest-Based Ads notice." But when you follow that link, Defendants instead state that they "do not use information which on its own identifies you, such as name . . . ." The Privacy Notice disclaimer makes it sound like you cannot be personally identified at all with the information Defendants use for targeted ads, but the reality—as explained in the Internet-Based Ads notice—is that the aggregation of information that Defendants use *can* identify you.

[29] Amazon Prime Terms and Conditions, https://www.amazon.com/gp/help/customer/display.html?nodeId=G2B9L3 YR7LR8J4XP (last updated May 11, 2021).

---

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

17

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

74.     The Amazon Prime Video Terms of Use ("Video Terms of Use") state that the agreement for video rental services is between the consumer and the "entity providing Amazon Prime Video Service" to the consumer.[30] The entity providing Amazon Prime Video Service in the United States is Amazon Services.

75.     The Video Terms of Use also state that in addition to the terms governing a specific provider, a separate Privacy Notice, Conditions of Use, and Amazon Prime Video Usage Rules may be applicable to the use of the service, along with "any rules or usage provisions specified on any product detail page or on any help or other informational page for the Amazon Prime Video service."[31]

76.     The Video Terms of Use page does not explicitly or clearly disclose that PII related to video usage is disclosed to third parties.

77.     Instead—buried in section 4(l), or twenty-two paragraphs in—it vaguely states that "[w]hile viewing certain Channels and Sports and Live content, Amazon may provide information about your viewing behavior to third parties for purposes of audience measurement and market research" and contains a hyperlink for further information.[32]

78.     The hyperlink identifies Nielsen as a third party and states that information about consumers' viewing behavior may be shared with Nielsen when consumers watch AMC+, Paramount+, and Thursday Night Football.[33] The link to this "disclosure" is buried at the end of a section titled "Digital Content" in the Video Terms of Use and is not in a "form distinct and

---

[30] Amazon Prime Video Terms of Use, https://www.primevideo.com/help?nodeId=202095490 (last updated October 19, 2023).

[31] *Id.*

[32] *Id.*

[33] What Are Nielsen Viewing measurements? https://www.amazon.com/gp/help/customer/display.html?nodeId=202 207330&view-type=content-only (last accessed February 29, 2024).

separate from any form setting forth other legal or financial obligations of the consumer" as required under the VPPA.

79.    This "disclosure" only applies to one third party, only includes three discrete items, and does not include any explicit disclosures or information about video rental history.

80.    Nielsen's own Digital measurement privacy statement—accessed via yet another separate link—vaguely says that it "generally do[es] not (and cannot) identify, or attempt to identify, the individuals about whom we collect content measurement data."[34]

81.    The only other mention of any potential sharing of PII related to video services in the Video Terms of Use is found under a section titled "Software," which states that "We **may** provide certain information regarding your subscription status and use of Digital Content, including viewing history, to video content providers, such as third parties offering subscription services through Prime Video Channels. We will provide this information in a manner that is not identifiable to you (unless you authorize sharing identifiable information with a specific video content provider)."[35]

82.    The Amazon Prime Video Usage Rules, which are hyperlinked on the Video Terms of Use page, fail to disclose that PII related to video usage is shared with third parties.[36]

83.    In short, not only are these "disclosures" regarding the sharing of consumers' PII-related video usage with third parties vague and incomplete, but they are also <u>not</u> distinct and separate from the rest of the Video Terms of Use and are instead buried in a scattershot fashion throughout. This is a clear violation of the VPPA's strict requirements.

84.    The Amazon Prime Video Service Provider Information and Applicable Terms and

---

[34] Digital measurement privacy statement, https://www.nielsen.com/legal/privacy-principles/digital-measurement-privacy-statement/?lang=en-us (last accessed February 29, 2024).

[35] Amazon Prime Video Terms of Use, at section 5(b), https://www.primevideo.com/help?nodeId=202095490&pop-up=1 (last updated October 19, 2023) (emphasis added).

[36] Amazon Prime Video Usage Rules, https://www.primevideo.com/help?nodeId=202095500 (last accessed February 29, 2024).

Policies, are also hyperlinked on the Video Terms of Use page. Under a "Applicable Terms and Legal Notices" Subheading, there are additional links leading back to the Amazon Prime Video Usage Rules page, the Video Terms of Use Page, along with the Conditions of Use page, the Privacy Notice page, an Internet-Based ads page, and a Twitch Terms of Service Page.[37]

85.     Notably, users who sign up for a regular Amazon account (*i.e.*, not a Prime account) are only ever presented with Amazon's Conditions of Use and Privacy Notice, as described above. However, once logged in to a regular Amazon account, users can access Prime Video and rent, purchase, or watch FreeVee or "first episode free" videos without seeing or agreeing to any other disclosures.

86.     Users with regular Amazon accounts are never asked to acknowledge or are even directed to the Video Terms of Use before accessing Amazon Prime Video content.

**C.     The only opt-out provisions that could be related to the VPPA are neither clear nor conspicuous and do not allow a consumer to opt out of disclosures to co-branded subsidiaries.**

87.     The Amazon.com Privacy Notice Page, under a section titled "What Choices do I Have?", states that "You may adjust your personalized advertising preferences by visiting [the Privacy Choices page]" with an accompanying hyperlink.[38]

88.     The Privacy Choices page does not contain an opt-out provision as to Amazon affiliates and is not clear and conspicuous.

89.     Instead—assuming consumers are even able to find this page—they are only permitted to opt-out of ads on non-Amazon affiliated websites. As such, the Privacy Choices page does not comply with the VPPA's opt-out requirements. Further, the opt-out option for unrelated third

---

[37] Amazon Prime Video Service Provider Information and Applicable Terms and Policies, https://www.primevideo.com/help?nodeId=202064890 (last accessed February 29, 2024).

[38] Privacy Notice, https://www.amazon.com/gp/help/customer/display.html/ref=ap_register_notification_privacy_notice?ie=UTF8&nodeId=468496 (last updated March 31, 2024).

---

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                          20

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

parties is not clear and conspicuous, so it does not comply either.

90.    **The Privacy Choices page tells consumers that (1) Amazon is already disclosing consumers' data to other Amazon-related entities; (2) Amazon is already using consumers' data from different Amazon entities to target consumers with advertisements; and (3) Amazon will continue these practices even if consumers opt-out of cross-context behavioral ads.** *See* Privacy Choices ("We'll continue to share your data with our co-branded subsidiaries. We'll also continue to show you ads based on your activity on Amazon's sites and apps and those of our co-branded subsidiaries.").

91.    On the Privacy Choices page there is an option to "Allow cross-context behavioral ads" and there is an option to opt-out.[39]

92.    Cross-context behavioral ads use data from one company's site or app to advertise to you on a different company's site or app.

93.    If a consumer opts out, Amazon states that it will not "[u]se information about your use of our store and services to deliver ads to you off of Amazon's own properties."[40]

94.    However, Amazon states that it will "continue to share your data with our co-branded subsidiaries" and will "continue to show you ads based on your activity on Amazon's sites and apps and those of our co-branded subsidiaries."[41] There is no opt-out provision to prevent inter-affiliate disclosure of a consumer's PII.

95.    "Co-branded subsidiaries" is not a defined term on either the Privacy Choices page or the preceding Amazon.com Privacy Notice Page.

---

[39] Privacy Choices, https://www.amazon.com/privacyprefs?ref_=footer_iba (last accessed February 29, 2024).
[40] *Id.*
[41] *Id.*

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

96.    The "Advertising Privacy and Preferences" page[42] follows this same pattern, allowing consumers to opt-out from targeted ads on unrelated websites, but not on Amazon's own websites.[43] Like the Privacy Choices page, the "Advertising Privacy and Preferences" page does not satisfy the clear and conspicuous requirement. In other words, is it impossible for consumers to opt out of having their data shared with Amazon Services' affiliates and the limited opt-out options that do exist do not comply with the VPPA's strict mandate that the opt-out provision be clear and conspicuous.

### D.    Amazon's Refusal to Deny That it Shared Consumer Data Supports the Reasonable Inference that Amazon has Shared Consumers' Data.

97.    Under Cal. Civil Code § 1798.110 *et. seq.*, pursuant to a California consumer's request, Amazon is required to disclose information to that consumer about, *inter alia*, the personal information it collects about that consumer and the third parties it discloses that information to.

98.    Plaintiff Johnson, a California resident, requested her data under Cal. Civil Code § 1798.110 *et. seq.* on July 10, 2024, through her Amazon account via Amazon's "request your data webpage." Amazon produced only two folders—"Digital.Subscriptions.1" and "CustomerCommunicationsExperience.Preferences."

99.    These two folders—which only contain information related to subscription preferences and billing—do not constitute all of the data Amazon collects about Johnson (e.g., purchase history, search history, etc.).  For example, when Johnson watches videos on Amazon Prime Video, Amazon tracks which shows she has already watched. This is apparent because her account prompts her to resume watching certain shows. Yet, Amazon did not produce this tracking data in

---

[42] Notably, it is difficult for a user to access this page, as they must first navigate to the Interest-Based Ads page via a hyperlink from the Privacy Notice or Privacy Choices page, only to find and click another hyperlink to access their "Advertising Preferences."

[43] Advertising Privacy and Preferences, https://www.amazon.com/adprefs (last accessed February 29, 2024).

---

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

response to Johnson's data request. As another example, even though Amazon directs California and non-California residents to the same data request page, Beagle received substantially more information than Johnson received upon making a similar data request to Amazon through that page. In response to her request, Beagle received 143 folders of responsive information, including folders for "advertising", "search history", and more.[44] These examples suggest that Amazon did not provide full responses to Johnson's request.

100.     Moreover, the response Johnson received from Amazon did not contain anything regarding any third parties that Amazon shares Johnson's data with. Even if none of Johnson's data was sold or shared, Amazon was required to disclose that fact. *See* Cal. Civ. Code § 1798.115(c)(1) ("[I]f the business has not sold or shared consumers' personal information, it shall disclose that fact."); *Id.* § 1798.115(c)(2) (similar); *see also* 105 Cal. Op. Att'y Gen. 26 (2022) ("If a business is unable to comply completely with a request, it is still obliged to provide as much information as it can."). Amazon failed to provide any such disclosures to Johnson.

101.     In this Court's decision granting Amazon's motion to dismiss Plaintiffs' Consolidated Amended Complaint, the Court held "Amazon is correct that Plaintiffs allege, at most, the mere *possibility* that information could be disclosed to those affiliates, rather than that Amazon Services had *in fact* made such disclosures," and "[t]hat Amazon Services allegedly provides access to Plaintiffs' PII does not plausibly suggest that Amazon Services has taken the affirmative act of disclosing that data to Amazon.com, Inc. or that Amazon.com, Inc. has actually received that data."

102.     As a result of this holding, Plaintiffs filed a motion for expedited discovery on September 20, 2024, seeking limited discovery regarding disclosure of Plaintiffs' personal

---

[44] Plaintiffs do not suggest that Beagle received all the information a California resident is entitled to under Cal. Civil Code § 1798.110 *et. seq.* Rather, the comparison between the information received from Beagle's and Johnson's data requests demonstrates that Amazon did not disclose all of the information it had pertaining to Johnson.

information.  In its Opposition to the motion, Amazon represented that Johnson could "simply ask" for her additional data through the Amazon portal for further support. ECF No. 51 at 13.

103.    Johnson pursued that option on October 3, 2024. Johnson submitted her request on amazon.com/hz/contact-us/request-data (the "Data Request Page").   Johnson submitted her request through the form on the Data Request Page, which sent Amazon an email with her request. In her email, Johnson asked Amazon to provide all data, including any information she was entitled to under Cal. Civ. Code §§ 1798.110 and 1798.115(c). Johnson did not receive additional information from Amazon in response to her request. The same day, Johnson submitted a complaint to the California Privacy Protection Agency for Defendants' refusal to provide the requested data information in violation of the California Consumer Privacy Act.

104.    On October 8, 2024, Johnson, through counsel, *again* requested that Defendants disclose this information that she is entitled to under California law. Johnson requested (in bold) that "**[i]f none of [her] data was sold or shared . . . that [Amazon] explicitly so state as required by law," and cited relevant authority supporting that request.**  A copy of the October 8, 2024 letter is attached hereto as Exhibit A.

105.    Despite the importance of the question as reflected in this Court's decision quoted above, Amazon's counsel refused to deny that Johnson's data was sold or shared as required under California law.  Instead, on October 14, 2024, it responded by email stating that Johnson could once again request her data through Amazon's website (as she had already done on July 10, 2024) or submit a more specific and detailed follow-up request on Amazon's website (as she did on October 3, 2024). On October 16, 2024, Defendant's counsel requested Johnson's email address. Johnson's counsel provided her email the same day.  As of October 21, 2024, Amazon has not supplemented Johnson's data request, despite her numerous attempts to request it.

106.    Amazon's repeated refusal to affirmatively tell Johnson whether her data was sold or shared leads to the reasonable inference, even likely one, that it has been shared. This inference is further supported by the *Behind the Screens* Report, which revealed that Amazon Inc./Twitch, refused to provide the FTC with a comprehensive list of all third-party entities with whom they shared Personal Information. Amazon's violations of California law and the FTC's 6(b) lead to the inference that Defendants are violating video privacy laws.

### E.    Plaintiffs

***Plaintiff Beagle***

107.    Beagle has an Amazon account and has rented videos through that account.

108.    Beagle has also registered for access to Paramount+ and Noggin through her Amazon Prime Video account.

109.    As a United States resident, Beagle contracted with Amazon Services to access Amazon Prime Video.

110.    Beagle did not consent to the disclosure of her PII to Amazon Inc., other Amazon affiliates, or unrelated third parties.

111.    Beagle has purchased or rented ten items from Amazon Prime Video and has streamed additional video content. Her purchases and rentals include:

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                                    25

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

| Content Name | Type of Purchase | Date Purchase | Price |
|---|---|---|---|
| *Rudolph the Red-Nosed Reindeer* | Buy | November 26, 2021 | $9.99 |
| *Band of Brothers* | Buy | November 12, 2021 | $14.99 |
| *The Lord of the Rings: The Fellowship of the Ring (Extended Edition)* | Buy | May 25, 2023 | $14.99 |
| *The Lord of the Rings (1978)* | Rent | June 6, 2023 | $3.99 |
| *Steve and Maggie – Christmas Special (Vol. 12)* | Rent | July 7, 2023 | $1.99 |
| *The Angry Birds Movie* | Rent | September 11, 2023 | $3.99 |
| *Pinkfong! Baby Shark & Halloween Songs - Halloween Monster Tree* | Buy | November 21, 2023 | $1.99 |
| *Total Recall* | Buy | December 10, 2023 | $9.99 |
| *Frosty the Snowman* | Buy | December 11, 2023 | $7.99 |
| *Gremlins* | Rent | January 16, 2024 | $3.99 |
| *Star Trek II: The Wrath of Khan* | Rent | February 5, 2024 | $3.99 |

112.    When Beagle purchased and/or rented these videos, Amazon Services collected the content viewed—down to the precise number of seconds watched—along with the name, address, email address, credit card information, and other identifying information for Beagle.

113.    Some of her rentals have also long-since expired, including, for example, *The Lord of the Rings (1978)* (June 6, 2023). Most video rentals through Amazon Prime Video are for 30-day rental periods with a 48-hour watch window once the film is started—including *The Lord of the*

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                        26

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

*Rings (1978)*. Beagle has already completed payment for her rentals. Her PII regarding this old rental data is no longer necessary for the purposes for which it was collected. She does not have any outstanding requests to view this information, and Beagle has not been notified of any pending requests or orders for access to this information for other permitted purposes set forth under the VPPA, such as requests pursuant to a court order or law enforcement agency. As such, her PII related to these rentals should have been destroyed months ago (in the case of *The Lord of the Rings (1978)*, approximately August 5, 2023, at the latest). Nonetheless, Amazon Services continues to store this improperly collected PII.

114.    Amazon Services subsequently disclosed that information to Amazon Inc. by providing Amazon Inc. with direct access to Amazon Services' database with information on Beagle, including access to a trove of Beagle's data, including the titles of videos watched, playback start dates and times, playback end dates and times, whether it was a purchase or rental history, billing address, ISP information, and location information.

115.    Amazon Services also disclosed that information to third parties both under the guise of "audience measurement" and "cross-context behavioral ads."

116.    Amazon Services has Beagle's PII going back to November 16, 2019, but upon information and belief, there are no qualifying, pending requests or orders for access to that information. Even though those orders are long-since completed, Amazon Services has not destroyed that data.

117.    Furthermore, Beagle anticipates buying or renting additional video content in the future, but would like to do so subject to the opt-out provision she is entitled to under the VPPA.

### Plaintiff Guerrero

118.    Guerrero has an Amazon Prime account and has purchased, rented, and streamed videos through that account.

119.    As a United States resident, Guerrero contracted with Amazon Services to access Amazon Prime Video.

120.    Guerrero did not consent to the disclosure of his PII to Amazon Inc., other Amazon affiliates, or unrelated third parties.

121.    Guerrero has purchased, rented, or streamed approximately 196 items from Amazon Prime Video, including approximately twelve watched or available in the past couple of years alone:

| Content Name | Type of Purchase | Date Purchase | Price |
|---|---|---|---|
| *Jaws* | Rent | November 6, 2022 | $4.32 |
| *Seven (1995)* | Rent | November 5, 2022 | $4.32 |
| *Fargo* | Rent | November 5, 2022 | $4.32 |
| *The Matrix* | Rent | June 19, 2023 | $4.32 |
| *Roadrunner: A Film About Anthony Bourdain* | Rent | June 8, 2023 | $4.32 |
| *Interstellar* | Rent | June 2, 2023 | $4.32 |
| *The Menu* | Rent | May 6, 2023 | $4.32 |
| *Parasite* | Rent | April 30, 2023 | $4.32 |
| *American History X* | Rent | April 30, 2023 | $4.32 |
| *Arrival* | Rent | February 12, 2023 | $4.32 |
| *Forged in Fire Season 8* | Buy | December 17, 2020 | $2.15 |
| *The Nightmare Before Christmas* | Buy | Upon information and belief, October 17, 2016 | $10.81 |

122.    When Guerrero purchased, rented, and streamed the videos, Amazon Services collected the content viewed—down to the precise number of seconds watched—along with the name, address, email address, credit card information, and other identifying information for Guerrero.

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                                    28

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

123.    Some of his rentals go as far back as 2016 and 2017, including, for example, *SLC Punk* (March 2, 2017). Most video rentals through Amazon Prime Video are for 30-day rental periods with a 48-hour watch window once the film is started—including *SLC Punk*. Guerrero has long since paid for such rentals and his PII is no longer necessary for the purposes for which it was collected in relation to these old video rentals. Guerrero does not have any outstanding requests to view this information, and Guerrero has not been notified of any pending requests or orders for access to this information for other permitted purposes set forth under the VPPA, such as requests pursuant to a court order or law enforcement agency. As such, his PII related to these rentals should have been destroyed long ago (in the case of *SLC Punk*, approximately April 1, 2017 at the latest). Nonetheless, Amazon Services continues to store this improperly collected PII.

124.    Amazon Services subsequently disclosed that information to Amazon Inc. by providing Amazon Inc. with direct access to Amazon Services' database with information on Guerrero, including access to a trove of Guerrero's data, including the titles of videos watched, playback start dates and times, playback end dates and times, whether it was a purchase or rental history, billing address, ISP information, and location information.

125.    Amazon Services also disclosed that information to third parties both under the guise of "audience measurement" and "cross-context behavioral ads."

126.    Amazon Services has Guerrero's PII going back to December 13, 2015, but upon information and belief, there are no qualifying, pending requests or orders for access to that information. Even though those orders are long-since completed, Amazon Services has not destroyed that data.

127.    Furthermore, Guerrero anticipates buying, renting, and streaming additional video content in the future, but would like to do so subject to the opt-out provision he is entitled to under the VPPA.

*Plaintiff Johnson*

128.    In or around 2017, Johnson created an Amazon account.

129.    Johnson has rented and purchased videos on Prime Video through that account.  Her digital orders include *The Little Mermaid* (11/2/2022); *Eternals* (7/11/2022); *Dune* (1/24/2022); and *Belly* (7/16/21), among others.

130.    When watching videos on Prime Video, Johnson has been prompted to resume and/or keep watching videos.  However, Defendants did not produce this information in response to her data requests.

131.    As a United States resident, Johnson contracted with Amazon Services to access Amazon Prime Video.

132.    Johnson did not consent to the disclosure of her PII to Amazon Inc., other Amazon affiliates, or unrelated third parties.

133.    Johnson purchased or rented videos from Prime Video and has streamed additional video content.

134.    When Plaintiff Johnson purchased and/or rented these videos, Amazon Services collected the content viewed, including the name of the videos watched, the duration watched, and other identifying information such as name, address, email address, and credit card information.

135.    Amazon Services disclosed that information to Amazon Inc., by providing Amazon Inc. with direct access to Amazon Service's database with information on Johnson, including access to Johnson's data, including the titles of videos watched, playback start dates and times, playback end dates and times, whether it was a purchase or rental history, billing address, ISP information, and location information.

136.    Amazon Services also disclosed that information to third parties both under the guise of "audience measurement" and "cross-context behavioral ads."

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                        30

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

137.    Furthermore, Johnson anticipates buying or renting additional video content in the future, but would like to do so without the disclosure of her personal information.

## V.    CLASS ACTION ALLEGATIONS

138.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

139.    Plaintiffs bring this action on behalf of themselves and all other similarly-situated persons as a class action pursuant to Federal Rule of Civil Procedure 23.

140.    Plaintiffs seek to represent a class composed of and defined as follows, and all subject to confirmation, clarification, and/or modification based on discovery to be conducted in this action:

> **All persons nationwide who have rented, purchased, or streamed audiovisual content from Amazon Prime within the applicable statute of limitations and as permitted by applicable tolling periods.**[45]

141.    Johnson also seeks to represent a sub-class composed of and defined as follows and for their California law claims:

> **All persons in the State of California who have Prime Video and amazon.com accounts, and viewed videos on Prime Video.**[46]

142.    Excluded from the Class are: (1) Defendants, including any entity in which either defendant has a controlling interest, and any of Defendants' legal representatives, officers, directors, employees, assigns, and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

---

[45] Hereinafter referred to as the "Nationwide Class." Class Period is defined as all video rental, purchase, or streaming within the applicable statute of limitations and any tolling periods.

[46] Hereinafter referred to as the "California Class" and, together with the Nationwide Class, as the "Class."

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                          31

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

143.   **Numerosity**: While the exact number of Class Members is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants. Even before the pandemic led to unprecedented growth in online video content services, around 26 million people in the United States streamed videos on Amazon Prime.[47] Therefore, the Class Members are so numerous that the individual joinder of all Class Members is impracticable under Federal Rule of Civil Procedure 23(a)(1).

144.   **Commonality**: There are common questions of law that exist as to all Class Members pursuant to Federal Rule of Civil Procedure 23(a)(2). Because Defendants' Conditions of Use require application of federal law, the VPPA governs the claims of all Nationwide Class Members. Similarly, California law applies to all members of the California Class. These common legal and factual issues include:

a.   Whether Amazon Services has violated the VPPA through its disclosure of personally identifiable information to other Amazon entities without obtaining Nationwide Class Members' informed written consent or providing a clear opt-out provision;

b.   Whether Amazon Services has violated the VPPA through its disclosure of personally identifiable information to third-party entities conducting audience measurement analysis without obtaining Nationwide Class Members' informed written consent or providing a clear opt-out provision;

c.   Whether Amazon Services unlawfully disclosed and continues to disclose its users' PII in violation of California Civil Code § 1799.3;

---

[47]   https://www.reuters.com/article/us-amazon-com-ratings-exclusive/exclusive-amazons-internal-numbers-on-prime-video-revealed-idUSKCN1GR0FX.

145. **Typicality**: Plaintiffs' claims are typical of the claims of the Class Members whom they seek to represent under Federal Rule of Civil Procedure Rule 23(a)(3) because Plaintiffs and each Class Member purchased, rented, and/or subscribed to video content through Amazon Prime; because Class Members seek the same relief under the VPPA (and the California Class Members seek the same relief under California Civil Code § 1799.3); and because Class Members seek the same injunctive relief and nominal damages. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class Members.

146. **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class Members. Plaintiffs do not have any interest which might cause them to not vigorously pursue this action. There are no conflicts between Plaintiffs and the unnamed Class Members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. Therefore, the interests of the Class Members will be fairly and adequately protected.

147. Further, Plaintiffs have retained competent counsel, including counsel experienced in complex class action litigation, including consumer protection and privacy cases. Class counsel have experience in complex litigation and have the financial and legal resources to meet the costs and legal issues associated with this type of litigation.

148. A class action is the superior method for the fair and efficient adjudication of this controversy pursuant to Federal Rule of Civil Procedure 23(b). Prosecuting separate actions on behalf of individual class members would create a risk of inconsistent adjudications while adjudication of issues in one individual matter will be dispositive of those issues in all individual cases. The injury suffered by each individual Class Member is relatively small in comparison to

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                    33

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

1   the burden and expense of individual prosecution of the complex and extensive litigation

2   necessitated by Defendants' conduct.

3   149.    Additionally, questions of law and fact common to Class Members predominate here.

4   There are few difficulties in managing this case as a class action, whereas there are many

5   difficulties associated with proceeding on an individual basis. It would be virtually impossible for

6   individual Class Members to effectively redress the wrongs done to them. Even if the Class

7   Members could afford such individual litigation, the court system could not. Individualized

8   litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation

9   increases the delay and expense to all parties, and to the court system, presented by the complex

10  legal and factual issues of the case. By contrast, the class action device presents far fewer

11  management difficulties, and provides the benefits of single adjudication, an economy of scale,

12  and comprehensive supervision by a single court. Upon information and belief, members of the

13  Class can be readily identified and notified based on Defendants' extensive consumer files on each

14  claimant.

## VI.    CAUSES OF ACTION

### A.    Amazon Services' Violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 (As to All Plaintiffs)

150.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

151.    Plaintiffs bring this count under the VPPA, individually and on behalf of the other members of the Class, against Defendant Amazon Services.

152.    Plaintiffs and the Class Members are "consumers" within the meaning of the VPPA because they are renters, purchases, or subscribers of goods or services from Amazon Services. 18 U.S.C. § 2710(a)(1).

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                                34

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

153.    Amazon Services is a video tape service provider under the VPPA because it is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

154.    Amazon Services gathers and shares consumers' PII with Amazon Inc. and other affiliates. This information includes "content interaction information, such as content downloads, streams, and playback details, including duration and number of simultaneous streams and downloads, and network details for streaming and download quality, including information about [consumers'] internet service provider."[48]

155.    Amazon Services also discloses this information to third parties both under the guise of "audience measurement" and "cross-context behavioral ads."

156.    Amazon Services chose and continues to choose to disclose consumers' PII without the informed, written consent mandated by 18 U.S.C. § 2710(b)(2). The limited, written "disclosures" that Amazon Services provides do not comply with the time limits set forth by VPPA and do not allow the required case-by-case withdrawal or withdrawal on an ongoing basis. Any "disclosures" that Amazon Services shares consumers' PII related to video usage with third parties are obscure and, importantly, not separate and distinct from the rest of the fine print. Procedurally, the opt-out provision—to the extent it exists—is not provided in a clear and conspicuous manner.

157.    Liquidated damages, punitive damages, reasonable attorneys' fees and litigation costs, and equitable relief should be awarded for Amazon Services' violations of the Video Privacy Protection Act under 18 U.S.C. § 2710(c)(4).

---

[48] Amazon.com Privacy Notice, *supra* note 22.

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                                    35

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

**B.    Amazon Services' Violation of California Civil Code § 1799.3 (As to Plaintiff Johnson)**

158.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

159.    Johnson brings this claim individually and on behalf of the members of the proposed California Class against Amazon Services.

160.    Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales … services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

161.    Amazon Services is a "person providing video recording sales … services" because it sells access to its online video stream platform, Prime Video, which hosts and delivers thousands of videos on Amazon's Prime Video platforms.

162.    Amazon Services disclosed consumers' PII to Amazon Inc. and other Amazon affiliates. This includes "content interaction information, such as content downloads, streams, and playback details, including duration and number of simultaneous streams and downloads, and network details for streaming and download quality, including information about [consumers'] internet service provider."[49]

163.    Johnson and the California Class members viewed videos using Prime Video.

164.    Amazon Services willfully disclosed Johnson's PII because it used that data to for audience measurement purposes, marketing purposes, market research purposes, advertising purposes, and other data collection and analysis purposes.

---

[49] Privacy Notice, https://www.amazon.com/gp/help/customer/display.html/ref=ap_register_notification_%20priva cy_notice?ie=UTF8&nodeId=468496.

SECOND AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                              36

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

165.    Johnson and the California Class members did not provide Amazon Services with any form of consent—either written or otherwise—to disclose their PII to third parties.

166.    On behalf of herself and the Class, Johnson seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Johnson and the Class by requiring Defendant to comply with Cal. Civ. Code § 1799.3's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

A.    An order certifying the proposed Class, designating Plaintiffs as named representatives of the Nationwide Class and Johnson as named representative of the Nationwide Class and the California Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

B.    For the Nationwide Class, money damages, in the form of stipulated damages of $2,500 per violation from Amazon Services, a video tape service provider, for its violations of VPPA;

C.    For the California Class, money statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c);

D.    Equitable relief;

E.    For punitive damages, as warranted, in an amount to be determined at trial;

F.    Reasonable attorneys' fees and costs;

G.    Pre-judgment and post-judgment interest, as provided by law; and

H.    Such other and further relief as this Court deems just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all claims so triable.


DATED:  October 21, 2024                    Respectfully submitted,


**BURNS CHAREST LLP**
*(Admitted pro hac vice)*

<u>s/ Korey A. Nelson</u>
Amanda K. Klevorn (LA Bar #35193)
Korey A. Nelson (LA Bar #30002)
Laura S. Seggerman (TX Bar #24134116)
201 St. Charles Avenue, Suite 2900
New Orleans, LA 70170
T:  (504) 799-2845
F:  (504) 881-1765
E:  aklevorn@burnscharest.com
     knelson@burnscharest.com
     lseggerman@burnscharest.com

Cristina Delise (NY Bar #5442033)
Burns Charest LLP
757 Third Avenue, 20th Floor
New York, New York 10017
469.904.4550 main
469.663.5940 direct
469.444.5002 fax
cdelise@burnscharest.com

*Interim Co-Lead Counsel for the*
*Nationwide Class*

**DUNCAN LAW, PLLC**

*s/ Shaquelle M. Duncan*
Shaquelle M. Duncan (WA Bar #56701)
410 SW 10th Street, Suite 215
Renton, WA 98057
Telephone: (206) 237-7714
Facsimile: (206) 238-1324
Email: duncans@duncanlawpllc.com

*Additional Counsel for Plaintiffs*


**BRAGAR EAGEL & SQUIRE, P.C.**
*(Admitted pro hac vice)*

*s/ Lawrence P. Eagel*
Lawrence P. Eagel (NY Bar #1924067)
  eagel@bespc.com
Casey C. DeReus (LA Bar #37096)
  dereus@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
810 Seventh Avenue, Suite 620
New York, NY 10019
Tel:  (212) 308-5858
Fax: (212) 486-0462

Melissa A. Fortunato (CA Bar #319767)
  fortunato@bespc.com
580 California Street, Suite 1200
San Francisco, CA  94104
Telephone: (415) 568-2124
Facsimile: (212) 304-0506

*Interim Co-Lead Counsel for the
Nationwide Class*


**CARSON NOEL PLLC**

Wright A. Noel
20 Sixth Avenue NE Issaquah, WA 98027
Tel: 425.837.4717
Fax: 425.837.5396
Email: wright@carsonnoel.com

*Additional Counsel for Plaintiffs*

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**BURSOR & FISHER, P.A.**
*(Admitted pro hac vice)*

*s/ Brittany S. Scott*
Brittany S. Scott
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: bscott@bursor.com

Joseph I. Marchese
Philip L. Fraietta
1300 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
Email: jmarchese@bursor.com
            pfraietta@bursor.com

*Additional Counsel for Plaintiffs*