The Honorable James L. Robart

1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**
                     **WESTERN DISTRICT OF WASHINGTON**
7                                **AT SEATTLE**

8
MEREDITH BEAGLE, JORDAN                    No.: 2:24-cv-00316
9 GUERRERO, and SOFAUNA JOHNSON on
Behalf of Themselves and All Others Similarly
10 Situated,
                              Plaintiffs,     **THIRD AMENDED COMPLAINT—**
11                                            **CLASS ACTION**
12      v.

13 AMAZON.COM, INC.                           DEMAND FOR JURY TRIAL
and AMAZON.COM SERVICES LLC.
14
                              Defendants.
15

16       Plaintiffs Meredith Beagle ("Beagle"), Jordan Guerrero ("Guerrero"), and Sofauna

17 Johnson ("Johnson" and together with Beagle and Guerrero, "Plaintiffs") individually and on

18 behalf of a class of similarly situated individuals, by and through their undersigned counsel, bring

19 this class action against Defendants Amazon.com, Inc. ("Amazon Inc.") and Amazon.com

20 Services LLC ("Amazon Services") (collectively "Defendants"). Plaintiffs bring claims for

21 violations of the Video Privacy Protection Act ("VPPA"). Johnson also brings claims against

22 Amazon Services for violations of California Civil Code § 1799.3. Plaintiffs allege the following

23 upon information and belief, except as to allegations specifically pertaining to each of their

24 respective claims, which are based on each client's personal knowledge:

THIRD AMENDED CLASS ACTION COMPLAINT          Burns Charest LLP
No. 2:24-cv-00316                      1      201 St. Charles Ave., Ste. 2900
                                              New Orleans, LA 70170
                                              (504) 799-2845

## I.    PRELIMINARY STATEMENT

1.    "[P]eople ought to be able to read books and watch films without the whole world knowing."[1] It is important for people to be able to "watch films without the whole world knowing," because disclosure of a consumer's private information allows for weaponization and consumer profiling.

2.    Weaponization of private data allows others to use a consumer's data against the consumer. One example of this is the risk of consumers' private data being disclosed and potentially used against them in the hiring process.[2] Another example involves an angry spouse in a child custody proceeding using video records to argue that the other parent is not fit to have custody.[3] These two examples of weaponization have actually happened, but there are countless other ways this data could be misused to hurt a consumer.

3.    In addition to potential weaponization, this private data can also be used to create and commercialize consumer profiles. Even in the late 1980s, before the internet was popular and when the VPPA was under Senate consideration in committee, Senator Patrick Leahy observed and denounced this growing risk to privacy, stating: "[I]n an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and 6 telephones, all lodged together in computers, it would be relatively easy **at some point** to give a **profile of a person** and tell what they buy in a store, what kind of food they like, what sort of television

---

[1] Joint hearing of the Senate Judiciary Subcommittee on Technology and the Law and the House Judiciary Subcommittee on Courts, Civil Liberties, and the Administration of Justice, 100 Cong. p. 10 (held on August 3, 1988) (Statement of Representative Al McCandless).

[2] The original impetus for the VPPA was the disclosure of United States Supreme Court nominee Judge Robert H. Bork's video rental list.

[3] The Senate Judiciary Committee Report on the VPPA noted one occasion when "the attorney for a woman in a child custody proceeding made an informal request for the records of every film rented by her husband in an effort to show that, based on his viewing habits, he was an unfit father." The Video Privacy Protection Act of 1988 - Report, Mr. Biden, from the Committee on the Judiciary (Oct. 21, 1988).

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

programs they watch, who are some of the people they telephone. I think that is wrong. **I think that really is Big Brother, and I think it is something that we have to guard against**."[4]

4.      More than 30 years later, the once-hypothetical risk Senator Leahy identified is now a reality. Defendants have amassed consumer data and built consumer profiles. For example, through its Whole Foods subsidiary, Amazon Inc. knows what kind of foods we like. Through Amazon Echo, Amazon Inc. knows who we call on the phone. And through Amazon Prime Video (operated by Amazon Services), Amazon knows what television programs and movies we watch.

5.      But unlike food and phone calls, thanks to the VPPA, there are limits on what information Amazon Services can legally disclose to Amazon Inc., other affiliates, and third parties based on what we watch. Generally, under the VPPA, a video service provider, such as Amazon Services, cannot disclose personally identifiable information ("PII") of a renter, purchaser, or subscriber of its goods or services.[5] PII includes any information identifying a consumer as having requested or obtained specific video materials or services from a video tape service provider.[6]

6.      As explained herein, Amazon Services discloses PII to its parent company—Amazon Inc.—on a regular basis in violation of the VPPA and California Civil Code § 1799.3. Amazon Services discloses consumers' PII to Amazon for audience measurement purposes, marketing purposes, market research purposes, advertising purposes, and other data collection and analysis purposes. None of these services are in the ordinary course of business as defined by the VPPA or the commercial purposes provision under California law. Upon information and belief, Amazon Services discloses PII to other Amazon affiliates as well.

---

[4] Hearings on Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the United States Before the Senate Committee on the Judiciary, 100th Cong., 1st Sess. 1372, 1374 (Sept. 28, 1987) (emphasis added).

[5] 18 USCS § 2710(b)(1).

[6] 18 USCS § 2710(b)(2)(B)(i). The identification need not be direct, but instead can be any relevant combination of information. *Campos v. Tubi, Inc.*, 2024 U.S. Dist. LEXIS 22247, at *28 (N.D. Ill. Feb. 8, 2024).

7.     Both direct admissions and circumstantial facts show that Amazon Services discloses PII to Amazon, Inc. and other affiliates.

8.     First, and most importantly, Amazon, Inc. and Amazon Services have admitted that they always share consumers' data among Amazon subsidiaries.[7]

9.     Second, Amazon's own joint data returns through the Amazon portal indicate data disclosure among co-branded subsidiaries. Even though Defendants and their affiliates claim that Amazon.com Services LLC is the Prime video service provider for United States consumers, Plaintiffs' data returns frequently show different sellers of record, including, for example, "Amazon.com Services, Inc." (seller of record for Johnson's purchase of *Killers of the Flower Moon*).

10.     Third, Amazon's response to Johnson's request for information under the California Consumer Privacy Act ("CCPA") suggests that Amazon Services has disclosed PII to Amazon.com, Inc. Defendants framed their entire CCPA response letter to Johnson as a joint response. As a result, while the letter affirmatively states that the Amazon entities *collectively* have not sold or shared Johnson's personal information, Defendants did not affirmatively state that Amazon entities have not sold or shared this information between or among themselves.[8] Additionally, by responding together, the letter shows that Amazon Inc. has reviewed and assessed

---

[7] The admission comes from Amazon's own fine print: "If you opt out [of cross context behavioral ads],**[w]e'll continue to share your data with our co-branded subsidiaries.** We'll also continue to show you ads based on your activity on Amazon's sites and apps and those of our co-branded subsidiaries." *See infra* ¶ 54, "Your Ads Privacy Choices" page (emphasis added). Additionally, there is no opt-out option for consumers to prevent inter-affiliate data sharing—much less a clear and conspicuous one—showing that this is standard practice.

[8] In a November 18, 2024 letter responding to Johnson's request for data information under the CCPA, the letter started as follows: "We write on behalf Amazon.com Services LLC, and Amazon.com, Inc. (together "Amazon") in response to the requests your client, Sofauna Johnson, submitted to Amazon under the California Consumer Privacy Act ("CCPA")" Throughout the rest of the letter, Defendants responded jointly, leaving unanswered the question of inter-affiliate / co-branded subsidiary sharing.

Amazon Services' Johnson data files, and vice versa. Otherwise, each entity would be responding to the data return based on speculation.

11.    Fourth, Amazon Inc. and its affiliates have a well-documented history of misleading consumers and misusing their data.  Examples of this include a Federal Trade Commission ("FTC") lawsuit against Amazon Inc. for using dark patterns to trap consumers in the Amazon Prime and the Amazon Prime Video systems; an FTC report exposing how Amazon Inc. and its affiliate, Twitch, impermissibly track personal consumer data; and two, separate reports from former Amazon employees or professionals describing Amazon's irresponsible sharing of private consumer data by allowing Amazon affiliates to unfettered access to Amazon's warehouse of data.[9]

### Defendants' Conduct Violates the VPPA

12.    The VPPA provides a handful of exceptions to the prohibition on disclosing PII, such as disclosure to a law enforcement agency pursuant to a warrant; disclosure to anyone with informed, written consent; disclosure to the consumer himself or herself; and disclosure incident to the video tape service provider's ordinary course of business.[10] Two of the exceptions most relevant here are the ordinary course of business exception and the informed, written consent exception. Neither one (nor any of the others) applies to Amazon Services' disclosures to Amazon.

---

[9] By providing Amazon Inc. with access to its warehouse of consumer data, Amazon Services has opened the warehouse door and invited Amazon Inc. to enter the door and extract the data from within, in contravention of the VPPA. *See, e.g., Czarnionka v. Epoch Times Ass'n, Inc.*, 2022 U.S. Dist. LEXIS 209067, at *9-10 (S.D.N.Y. Nov. 17, 2022) ("By installing the Pixel, Defendant opened a digital door and invited Facebook to enter that door and extract information from within. . . . Defendant's installation of the Pixel exposed its subscribers' information to Facebook. This is sufficient to constitute 'disclosure' under the VPPA.").

[10] 18 USCS § 2710(b)(2).

---

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

5

13.    The VPPA narrowly defines "ordinary course of business." It only includes debt collection, order fulfillment, request processing, and transfer of ownership.[11] But, as described herein, Amazon Services discloses PII for other, unauthorized purposes, such as marketing.

14.    The informed consent exception is also subject to specific statutory requirements. It requires a video service provider to obtain the explicit, informed, and written consent of the consumer before or contemporaneously with disclosure of the consumer's PII.

15.    Unlike in food or telecommunications sectors, where "Americans are forced to provide to businesses and others personal information without having any control over where that information goes," the VPPA empowers consumers in the video sector to control their data by regulating when and to whom certain data can be disclosed and for what purposes.[12]

16.    This informed consent exception has a form requirement, a timing requirement, and an opt-out requirement. These elements work in tandem to make sure consumers have actual knowledge—on the front end—of the specific video privacy rights they are giving away, and it provides them a way to opt-out.

17.    To satisfy the form requirement, informed consent must be presented in "a form distinct and separate from any form setting forth other legal or financial obligations of the consumer."[13]

18.    As one court has explained, "the plain language of the VPPA does indeed require video tape service providers to (1) request consumers' consent to a privacy disclosure that addresses only the use of personally identifiable information connected with video purchases and no other privacy

---

[11] 18 U.S. Code § 2710(a)(2).

[12] 134 Cong. Rec. S5401 (May 10, 1988) (statement of Senator Paul Simon) (noting when the Senate introduced the VPPA that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes, and dislikes.").

[13] 18 USCS § 2710(a)(3).

topic, and (2) obtain the act of consent separately from the consumer's agreement to the retailer's terms of use, general privacy policy, and the commercial terms of the purchase."[14]

19.    To satisfy the timing requirement, consent must be obtained either contemporaneously with or in advance of the disclosure sought—not after-the-fact.

20.    Finally, the video service provider must give an opportunity, in a clear and conspicuous manner, for the consumer to withdraw from any disclosure of his or her PII.

21.    Amazon Services—the video service provider for United States Amazon Prime Video consumers—does not comply, and has never complied, with the VPPA's requirements for informed written consent. Amazon Services[15] *repeatedly admits* that Amazon Services shares consumer data with Amazon Services affiliates like Amazon Inc.

22.    Additionally, reports from former Amazon information security professionals have described a data "free-for-all" within the Amazon empire. In other words, there is a free flow of data from Amazon Services to Amazon Inc. These data disclosure practices are more systemic than sending this data through one-off disclosures (such as through encoded pixels). Instead, Amazon Services maintains a virtual "warehouse" of data that it collects from consumers who are unable to opt-out and gives Amazon Inc. access to that database.

23.    Instead of a distinct and separate form governing video PII, Defendants bury all their privacy-related "disclosures" in a maze of hyperlinks and fine print.

24.    Amazon Services also does not provide consumers the opportunity to opt out of disclosing this information to affiliated Amazon entities. Instead, if customers wish to protect their PII from

---

[14] *Cappello v. Walmart Inc.*, No. 18-CV-06678-RS, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019).

[15] Defendants' Conditions of Use and Privacy Notice are vague about which Amazon entities the Conditions of Use and Privacy Notice refer to. For example, the Privacy Notice describes "how Amazon.com and its affiliates (collectively 'Amazon') collect and process your personal information," lumping Amazon Inc. and Amazon Services together for purposes of the Privacy Notice.

flowing to other Amazon entities, their only option is to forego the use of Amazon Services or risk a drop-off in services provided.

25.    Because of Amazon Services' systematic and repeated violations of the VPPA, Plaintiffs and the other Class Members seek damages and injunctive relief to protect their PII.

26.    Amazon Inc.'s unlawful practices include its knowing participation in receiving this ill-gotten information and using it to the detriment of its consumers. Amazon Inc. also creates and oversees the confusing maze of fine print used by its subsidiaries, including Amazon Services.

***Amazon Services' Conduct Violates Cal. Civ. Code § 1799.3(6)***

27.    Finally, Amazon Services' practices also violate California Civil Code § 1799.3. During the same time period that Congress enacted the VPPA, the California Legislature passed Cal. Civ. Code § 1799.3 into law to restrict the disclosure of video sale or rental records and protect Californian's privacy. 1988 Cal. Legis. Serv. 1050 (West) ("Existing law does not generally restrict the disclosure by persons providing video cassette sales or rental services of records prepared or maintained by those persons, although the California Constitution specifies privacy as one of the inalienable rights of all people in the state.").[16]

28.    California Civil Code § 1799.3 bars video service providers from disclosing any personal information, or the contents of any record, to any third party, without written consent. Amazon Services discloses consumers' PII to Amazon Inc. and other affiliates for audience measurement purposes, marketing purposes, market research purposes, advertising purposes, and other data collection and analysis purposes. None of these services fall within the ordinary course of business exception to § 1799.3, which, only permits the disclosure of names and addresses for commercial

---

[16] Cal. Civ. Code § 1799.3 was amended in 2009 to change "video cassettes" to "video recording."

purposes. *See* Cal. Civ. Code § 1799.3(6). Nor does Amazon Services obtain consumers' express written consent for such disclosures.

29.    In an effort to preserve Californian's right to privacy, Section 1799.3(a) provides that "[n]o person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

30.    While Section 1799.3 is similar to the VPPA, it provides far narrower exceptions to disclosure. Specifically, Section 1799.3 contains no exception for disclosure made in the ordinary course of business. Instead, it exempts "the disclosure of names and addresses only for commercial purposes." Cal. Civ. Code § 1799.3(6).

31.    Moreover, as described herein, Amazon Services does not comply with Section 1799.3's written consent requirement. Indeed, Amazon Services repeatedly admits that Amazon Services shares consumer data with Amazon Services affiliates like Amazon Inc.

## II.    PARTIES

32.    Plaintiff Beagle is a citizen of Charles City County in the State of Virginia. She is of the full age of majority.

33.    Plaintiff Guerrero is a citizen of the Parish of Orleans in the State of Louisiana. He is of the full age of majority.

34.    Plaintiff Johnson is citizen of Los Angeles County, California. She is of the full age of majority.

35.    Amazon Inc. is a Delaware corporation with its principal place of business in Seattle, Washington.

36.     Amazon.com Services is a Delaware limited liability company with its principal place of business in Seattle, Washington. Amazon Services is a wholly-owned subsidiary of Amazon Inc.

37.     Because of the central role Amazon Inc., Amazon Services, and other Amazon affiliates play in American society, Defendants' own fine print and responses to data requests, news articles, and other sources often simply refer to "Amazon" or "Amazon.com" without specifying which entity or entities are specifically being referenced. In such circumstances, the affiliate is referenced herein simply as "Amazon."

### III.     JURISDICTION AND VENUE

38.     This Court has diversity jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). This complaint states claims on behalf of a national class of consumers who are minimally diverse from Defendants. The amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

39.     This Court also has federal question jurisdiction under 28 U.S.C. § 1331 as this action arises, in part, under a federal statute, the VPPA.

40.     This Court has personal jurisdiction over Defendants because some of the acts alleged herein were committed in the state of Washington and because Defendants are registered to do business in this state and systematically and continuously conduct business in this state.[17]

41.     Venue is proper in this District under 28 U.S.C. § 1391(b) as to Amazon Inc. and Amazon Services because they (1) are both headquartered in this District; (2) transact business in this District; and (3) transacted business in this District at the time the cause of action arose.

---

[17] Defendants have also explicitly chosen to avail themselves of the laws of Washington. Defendants' Conditions of Use contain a choice of law agreement that states that "applicable federal law, and the laws of the state of Washington" govern all consumer disputes with Defendants.

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

10

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

## IV.    GENERAL ALLEGATIONS

**A.    Amazon Inc. has a well-documented history of providing misleading and incomplete information to consumers about the use, storage, and disclosure of their personal information.**

42.    Amazon Inc. is a huge, multinational corporation headquartered in Seattle, Washington. As of January 2024, Amazon Inc. has a market capitalization of $1.630 trillion.

43.    Amazon Inc. has been the subject of consumer protection actions and inquiries. In fact, on June 21, 2023, the Federal Trade Commission ("FTC") filed a lawsuit against Amazon Inc. for violations of the Federal Trade Commission Act and the Restore Online Shoppers' Confidence Act.[18]

44.    In *FTC v. Amazon.com, Inc.*, the FTC addressed specific unfair and deceptive practices by Amazon Inc. Specifically, the FTC explained that Prime Video is a distinct product from Prime, since Prime Video is a subscription-based video streaming service. As alleged by the FTC, although it is possible to sign up for Prime Video alone, it is difficult to do so. In the ongoing lawsuit, the FTC alleges that Amazon Inc.'s dark patterns trick consumers into signing up for Prime instead of Prime Video, which would be a lower-cost option.

45.    Once consumers have signed up, the FTC further alleges that Amazon Inc. knowingly complicates the cancellation process for Prime subscribers who sought to end their membership. As explained by the FTC, up until recently, "the primary purpose of the Prime cancellation process was not to enable subscribers to cancel, but rather to thwart them. Fittingly, Amazon named that process "Iliad," which refers to Homer's epic about the long, arduous Trojan War. Amazon designed the Iliad cancellation process ("Iliad Flow") to be labyrinthine, and Amazon and its leadership slowed or rejected user experience changes that would have made Iliad simpler for

---

[18] *Federal Trade Commission v. Amazon.com, Inc.*, 2:23-cv-00932 (W.D. Wash. 2023).

consumers because those changes adversely affected Amazon's bottom line. As with nonconsensual enrollment, the Iliad Flow's complexity resulted from Amazon's use of dark patterns—manipulative design elements that trick users into making decisions they would not otherwise have made."[19]

46.     Once consumers are in the Amazon system, Defendants amass data profiles for consumers with little regard for protecting their privacy. Former Amazon chief information security officer Gary Gagnon described Amazon's internal access policies for customer information as a "free-for-all" among Amazon's global workforce.[20]

47.     One former, U.S.-based information security professional from Amazon explained that, "Amazon has grown so fast, it doesn't know what it owns . . . They don't know where their data is at . . . ."[21]

48.     One former employee stated: "We found hundreds of thousands of accounts where the employee is no longer there but they still have system access."[22]

49.     *A Look Behind the Screens: Examining the Data Practices of Social Media and Video Streaming Services* (hereinafter "*Behind the Screens* Report")—a recent FTC Staff report—sheds further light on Amazon Inc. and its affiliates' data practices.  The *Behind the Screens* Report summarizes the FTC's findings arising from 6(b) orders it issued to nine companies, including Amazon Inc. and its subsidiary, Twitch.[23]  The report states:

> **The Status Quo Is Unacceptable**: The amount of data collected by large tech companies is simply staggering. They track what we read, what websites we visit,

---

[19] *Id.* at 3.

[20] https://revealnews.org/article/inside-amazons-failures-to-protect-your-data-internal-voyeurs-bribery-schemes-and-backdoor-access/.

[21] https://www.politico.eu/article/data-at-risk-amazon-security-threat/.

[22] *Id.*

[23] https://www.ftc.gov/system/files/ftc_gov/pdf/Social-Media-6b-Report-9-11-2024.pdf.

---

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                    12

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

whether we are married and have children, our educational level and income bracket, our location, our purchasing habits, our personal interests, and in some cases even our health conditions and religious faith. They track what we do on and off their platforms, often combining their own information with enormous data sets purchased through the largely unregulated consumer data market. And large firms are increasingly relying on hidden pixels and similar technologies – embedded on other websites – to track our behavior down to each click. In fact, the Companies collected so much data that in response to the [FTC]'s questions, they often could not even identify all the data points they collected or all of the third parties they shared that data with.

50.    The *Behind the Screens* Report also discusses what companies, including Amazon Inc. and its affiliate Twitch, shared or disclosed. In response to an order requiring the companies to "[i]dentify those entities and [d]escribe in [d]etail the types of Personal Information and purposes for such sharing . . . ." the FTC reported that, "[n]o [c]ompany provided a comprehensive list of all third-party entities that they shared Personal Information with. Some Companies provided illustrative examples, whereas others claimed that this request was impossible.  A few Companies provided only the names of third-party entities with which the Company had entered a formal contract, thus omitting third parties that the Companies shared with that were not subject to contracts.  Altogether, the Companies' responses lacked clear explanations or specificity regarding the exact use cases for sharing with each entity. This lack of transparency could indicate an inability or unwillingness to account for the extent of those practices because consumers' data was shared so broadly.[24]

---

[24] As used in the *Behind the Screens* Report, "Personal Information" means information about a specific individual or Device, including: (1) first and last name; (2) home or other physical address, including street name and name of city or town, or other information about the location of the individual, including but not limited to location from cellular tower information, fine or coarse location, or GPS coordinates; (3) email address or other online contact information, such as an instant messaging user identifier or screen name; (4) telephone number; (5) a persistent identifier, such as a customer number held in a "cookie," a static Internet Protocol ("IP") address, a device identifier, a device fingerprint, a hashed identifier, or a processor serial number; (6) nonpublic Communications and content, including, but not limited to, e-mail, text messages, contacts, photos, videos, audio, or other digital images or audio content; (7) internet browsing history, search history, or list of URLs visited; (8) video, audio, cable, or TV viewing history; (9) biometric data; (10) health or medical information; (11) demographic information; or (12) any other information associated with that User or Device.

---

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

13

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

51.     The *Behind the Screens* report stated that "Most [c]ompanies acknowledged that they shared users' Personal Information with affiliates and other company-branded entities."

52.     Despite Amazon Inc.'s proclamations of the separateness of its entities when it suits its purposes and its insistence that it values consumer privacy, Amazon Services uses similar patterns of misdirection, confusing language, and fine print to minimize the privacy violations it and its affiliates participate in.

> **B.      Amazon Services' fine print does not satisfy the VPPA's strict statutory requirements regarding the disclosure of consumers' PII-related video usage history.**

**Additional Information Regarding Disclosure**

53.     Amazon Services' "disclosures" pertaining to the use of consumer information and consumer privacy are intentionally scattered throughout a series of online pages that must be navigated via a maze of misleading hyperlinks. The "disclosures" acknowledge that Amazon Services can and is sharing PII-related video usage history with both Amazon affiliates and unaffiliated third parties, but not in the separate, distinct format mandated by the VPPA and not with a clear notification of the right to opt-out.

54.     Examples of Amazon Services' own acknowledgment of disclosures include admissions in the Privacy Notice ("We share customers' personal information . . . with subsidiaries Amazon.com, Inc. controls"); on the "Your Ads Privacy Choices" page ("Privacy Choices page") ("If you opt out [of cross context behavioral ads],[w]e'll continue to share your data with our co-branded subsidiaries. We'll also continue to show you ads based on your activity on Amazon's sites and apps and those of our co-branded subsidiaries."); and on the "Advertising Privacy and Preferences" page ("If you choose not to be shown interest-based ads above, we won't: Use information about your use of our store and services to deliver ads to you **off of Amazon's own**

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                          14

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

**properties"** [but, by implication, *will* continue to target ads on Amazon's own properties]) (original emphasis removed, current emphasis added).

55. And while there is an inadequate opt-out for some information as to unaffiliated third parties, there is no opt-out at all for Amazon affiliates. Instead, Amazon Services' maze of fine print says that consumer data will be shared among its affiliates.

56. As described below, even though Defendants' fine print admits that Defendants collect and disclose consumers' data, Defendants do not obtain consumers' consent nor provide a clear and conspicuous opt-out.

57. The registration process to create a new Amazon or Amazon Prime Account—both of which include at least some level of Prime Video access—instead presents consumers with a maze of hyperlinks and fine print. First, a consumer is prompted to fill in his or her name, email, and password. There is no specific reference to video privacy disclosure, and consumers are not presented with an opt-out option or any other requests for consent relating to their video records. Instead, in fine print at the bottom, consumers are simply told, "By creating an account, you agree to Amazon's Conditions of Use and Privacy Notice." That disclaimer contains hyperlinks to the Conditions of Use and Privacy Notice.

1



amazon

**Create account**

Your name

[First and last name]

Email

Password

At least 6 characters

*i* Passwords must be at least 6 characters.

Re-enter password

[ Create your Amazon account ]

By creating an account, you agree to Amazon's Conditions of Use and Privacy Notice.

Already have an account? Sign in ›

Conditions of Use    Privacy Notice    Help

© 1996-2024, Amazon.com, Inc. or its affiliates

58.     Consumers are not required to check a box indicating that they have agreed to the Conditions of Use and Privacy Notice before proceeding.

59.     Consumers are not required to scroll through the text of the Conditions of Use and Privacy Notice before proceeding.

60.     Neither the Conditions of Use nor the Privacy Notice contain a request for consent or an opt-out provision.

61.     If a consumer clicks on "Conditions of Use," the consumer is directed to a lengthy page of fine print.[25]

62.     The Conditions of Use do not request consumers' consent to disclose PII.

---

[25] Conditions of Use, https://www.amazon.com/gp/help/customer/display.html/ref=ap_register_notification_conditio n_of_use?ie=UTF8&nodeId=508088 (last updated September 14, 2022). The Conditions of Use also contain a link to the same Privacy Notice that are displayed on the initial account-creation page.

63.    Even if the Conditions of Use did include such a request, it would not satisfy the VPPA's form requirement since the request would not be separate from other terms and conditions contained in the Conditions of Use.

64.    The Conditions of Use do not include an opt-out provision at all, much less a clear and conspicuous opt-out provision for disclosure of PII.

65.    If a user clicks on "Privacy Notice," the consumer is directed to another lengthy page of fine print.[26]

66.    The Privacy Notice does not request consumers' consent to disclose PII.

67.    Even if the Privacy Notice did include such a request, it would not satisfy the VPPA's form requirement since the request would not be separate from other terms and conditions contained in the Privacy Notice.

68.    The Privacy Notice itself does not include an opt-out provision. Instead, if privacy-conscious consumers want to limit the information they provide Amazon entities to protect their privacy, they are warned that—if they do not provide certain information to Amazon—they "might not be able to take advantage of many of our Amazon Services."

69.    Additionally, buried in the 3,634-word Privacy Notice's fine print, there is a hyperlink to the Privacy Choices page, which deals with cross-text behavior ads vis-à-vis third parties. This link is not clear and conspicuous. Instead, it is hyperlinked approximately halfway through the Privacy Notice.

**The Data Includes PII**

70.    Data that Plaintiffs have each requested and received from Amazon confirms that the trove

---

[26] Privacy Notice, https://www.amazon.com/gp/help/customer/display.html/ref=ap_register_notification_privacy_notice?ie=UTF8&nodeId=468496 (last updated March 31, 2024).  The Privacy Notice also contains a link to the same Conditions of Use that are displayed on the initial account-creation page.

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                        17

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

of data Amazon collects includes consumers' PII. For example, a spreadsheet titled "Digital Items" link Beagle's, Guerrero's, and Johnson's video rentals and purchases to a unique ID number ("OrderID"). Another spreadsheet titled "Digital Orders" links those same ID numbers to personal information, including the user's billing address.

**Prohibited Purposes of Disclosure**

71.     In addition to Amazon Services admitting that it discloses data, it also admits that the disclosures are for prohibited purposes.

72.     The Privacy Notice declares that Amazon entities "collect your personal information" and tells consumers that this collection includes three broad categories of data—(1) provided information (*i.e.*, information consumers provide to Amazon),[27] (2) automatic information (*i.e.*, information Amazon automatically gathers, such as information about your interaction with content);[28] and (3) information from other sources (*e.g.*, third party carriers).[29]

---

[27] Examples include: **identifying information such as your name, address, and phone numbers**; **payment information**; **age**; **location information**; **IP address**; people, addresses and phone numbers listed in your Addresses; email addresses of your friends and other people; content of reviews and emails to us; personal description and photograph in your profile; voice recordings from using Alexa; images and videos collected or stored in connection with Amazon Services; information and **documents regarding identity, including Social Security and driver's license numbers**; corporate and **financial information**; **credit history information**; and **device log files and configurations**.

[28] Examples include: the **internet protocol (IP) address** used to connect a consumer's computer to the internet; login, **email address**, and password; **location** of the consumer's device or computer; **content interaction information, such as content downloads, streams, and playback details**, including duration and number of simultaneous streams and downloads, and network details for streaming and download quality, including information about your internet service provider; device metrics; Amazon Services metrics; version and time zone settings; **purchase and content use history**, which is sometimes aggregated with similar information from other customers to create features like Top Sellers; the full Uniform Resource Locator (URL) clickstream to, through, and from Amazon.com websites, including products and content viewed or searched for; page response times, download errors, length of visits to certain pages, and page interaction information (such as scrolling, clicks, and mouse-overs); phone numbers used to call our customer service number; and images or videos when you shop in certain stores; **device identifiers, cookies, and other technologies on devices, applications, and Amazon web pages to collect browsing, usage, or other technical information**.

[29] Examples include: updated delivery and address information from carriers or other third parties, which Amazon uses to correct its records and deliver your next purchase or communication more easily; **account information, purchase or redemption information, and page-view information from some merchants with which Amazon operates co-branded businesses or for which it provides** technical, fulfillment, **advertising, or other services**; **information about your interactions with products and services offered by Amazon subsidiaries**; search results

---

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

73.   The Privacy Notice also states that Defendants "use 'cookies' and other unique identifiers, and [. . .] obtain certain types of information when your web browser or device accesses Amazon Services and other content served by or on behalf of Amazon on other websites . . . ."

74.   Finally, the Privacy Notice states that Defendants use consumers' personal information for a list of reasons. Some of these reasons include purposes that deal with debt collection, order fulfillment, or request processing (*e.g.*, "We use your personal information to take and handle orders, deliver products and services, process payments, and communicate with you about orders, products and services").[30] In another section, the Privacy Notice also indicates that the data could be disclosed as part of a transfer of ownership ("Also, in the unlikely event that Amazon.com, Inc. or substantially all of its assets are acquired, customer information will of course be one of the transferred assets.").

75.   However, many of the listed purposes do not fall within debt collection, order fulfillment, request processing, or transfer of ownership. These include, *inter alia*, using personal information to communicate about promotional offers, using personal information to assess and manage credit risks, and using personal information for targeted ads.[31]

76.   Consumers who sign up for an Amazon Prime account are also told in fine print that "[b]y signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions," which are hyperlinked.

---

and links, including paid listings; information about internet-connected devices and services linked with Alexa; **and credit history information from credit bureaus**, which we use to help prevent and detect fraud and **to offer certain credit** or financial services to some customers.

[30] The list is not an exhaustive list. The section merely states that "[t]hese purposes include"—suggesting that the list is illustrative and that there are even more purposes for which the data is used beyond those itemized in the list.

[31] The Privacy Notice itself states: "We do not use information that personally identifies you to display interest-based ads. To learn more, please read our Interest-Based Ads notice." But when you follow that link, Defendants instead state that they "do not use information which on its own identifies you, such as name . . . ." The Privacy Notice disclaimer makes it sound like you cannot be personally identified at all with the information Defendants use for targeted ads, but the reality—as explained in the Internet-Based Ads notice—is that the aggregation of information that Defendants use *can* identify you.

77.     Consumers are neither required to check a box indicating that they have agreed to the Amazon Prime Terms and Conditions, nor required to scroll through the text of the Amazon Prime Terms and Conditions before proceeding.

78.     Only by clicking on the hyperlink are consumers directed to the Amazon Prime Terms and Conditions Page, where they are informed that "If you sign up for a Prime membership, you accept these terms, conditions, limitations and requirements," listing a hyperlink to the Amazon Prime Video Terms of Use, among hyperlinks to the terms of use for other Amazon services.[32]

79.     The Amazon Prime Video Terms of Use ("Video Terms of Use") state that the agreement for video rental services is between the consumer and the "entity providing Amazon Prime Video Service" to the consumer.[33] The entity providing Amazon Prime Video Service in the United States is Amazon Services.

80.     The Video Terms of Use also state that in addition to the terms governing a specific provider, a separate Privacy Notice, Conditions of Use, and Amazon Prime Video Usage Rules may be applicable to the use of the service, along with "any rules or usage provisions specified on any product detail page or on any help or other informational page for the Amazon Prime Video service."[34]

81.     The Amazon Prime Video Service Provider Information and Applicable Terms and Policies are also hyperlinked on the Video Terms of Use page. Under a "Applicable Terms and Legal Notices" Subheading, there are additional links leading back to the Amazon Prime Video Usage Rules page, the Video Terms of Use Page, along with the Conditions of Use page, the

---

[32] Amazon Prime Terms and Conditions, https://www.amazon.com/gp/help/customer/display.html?nodeId=G2B9L3 YR7LR8J4XP (last updated May 11, 2021).

[33] Amazon Prime Video Terms of Use, https://www.primevideo.com/help?nodeId=202095490 (last updated October 19, 2023).

[34] *Id.*

Privacy Notice page, an Internet-Based ads page, and a Twitch Terms of Service Page.[35]

82.     Notably, users who sign up for a regular Amazon account (*i.e.*, not a Prime account) are only ever presented with Amazon's Conditions of Use and Privacy Notice, as described above. However, once logged in to a regular Amazon account, users can access Prime Video and rent, purchase, or watch FreeVee or "first episode free" videos without seeing or agreeing to any other disclosures.

83.     Users with regular Amazon accounts are never asked to acknowledge or are even directed to the Video Terms of Use before accessing Amazon Prime Video content.

>          **C.     The only opt-out provisions that could be related to the VPPA are neither clear nor conspicuous and do not allow a consumer to opt out of disclosures to co-branded subsidiaries.**

84.     The Amazon.com Privacy Notice Page, under a section titled "What Choices do I Have?", states that "You may adjust your personalized advertising preferences by visiting [the Privacy Choices page]" with an accompanying hyperlink.[36]

85.     The Privacy Choices page does not contain an opt-out provision as to Amazon affiliates and is not clear and conspicuous. Instead—assuming consumers are even able to find this page—they are only permitted to opt-out of ads on non-Amazon affiliated websites. As such, the Privacy Choices page does not comply with the VPPA's opt-out requirements.

86.     **The Privacy Choices page tells consumers that (1) Amazon is already disclosing consumers' data to other Amazon-related entities; (2) Amazon is already using consumers' data from different Amazon entities to target consumers with advertisements; and (3) Amazon will continue these practices even if consumers opt-out of cross-context**

---

[35] Amazon Prime Video Service Provider Information and Applicable Terms and Policies, https://www.primevideo.com/help?nodeId=202064890 (last accessed February 29, 2024).

[36] Privacy Notice, https://www.amazon.com/gp/help/customer/display.html/ref=ap_register_notification_privacy_no tice?ie=UTF8&nodeId=468496 (last updated March 31, 2024).

**behavioral ads.** *See* Privacy Choices ("We'll continue to share your data with our co-branded subsidiaries. We'll also continue to show you ads based on your activity on Amazon's sites and apps and those of our co-branded subsidiaries.").

87.     On the Privacy Choices page there is an option to "Allow cross-context behavioral ads" and there is an option to opt-out.[37]

88.     Cross-context behavioral ads use data from one company's site or app to advertise to you on a different company's site or app.

89.     If a consumer opts out, Amazon states that it will not "[u]se information about your use of our store and services to deliver ads to you off of Amazon's own properties."[38]

90.     However, Amazon states that it will "continue to share your data with our co-branded subsidiaries" and will "continue to show you ads based on your activity on Amazon's sites and apps and those of our co-branded subsidiaries."[39] There is no opt-out provision to prevent inter-affiliate disclosure of a consumer's PII.

91.     "Co-branded subsidiaries" is not a defined term on either the Privacy Choices page or the preceding Amazon.com Privacy Notice Page.

92.     The "Advertising Privacy and Preferences" page[40] follows this same pattern, allowing consumers to opt-out from targeted ads on unrelated websites, but not on Amazon's own websites.[41] Like the Privacy Choices page, the "Advertising Privacy and Preferences" page does not satisfy the clear and conspicuous requirement. In other words, is it impossible for consumers

---

[37] Privacy Choices, https://www.amazon.com/privacyprefs?ref_=footer_iba (last accessed February 29, 2024).

[38] *Id.*

[39] *Id.*

[40] Notably, it is difficult for a user to access this page, as they must first navigate to the Interest-Based Ads page via a hyperlink from the Privacy Notice or Privacy Choices page, only to find and click another hyperlink to access their "Advertising Preferences."

[41] Advertising Privacy and Preferences, https://www.amazon.com/adprefs (last accessed February 29, 2024).

to opt out of having their data shared with Amazon Services' affiliates and the limited opt-out options that do exist do not comply with the VPPA's strict mandate that the opt-out provision be clear and conspicuous.

### D. Amazon's Refusal to Deny That it Shared Consumer Data Supports the Reasonable Inference that Amazon has Shared Consumers' Data.

93.    Under Cal. Civil Code § 1798.110 *et. seq.*, pursuant to a California consumer's request, Amazon is required to disclose information to that consumer about, *inter alia*, the personal information it collects about that consumer and the third parties it discloses that information to. Plaintiff Johnson, a California resident, requested her data under Cal. Civil Code § 1798.110 *et. seq.* on July 10, 2024 and October 8, 2024.[42] Amazon subsequently produced approximately 1 GB of data regarding Johnson's Amazon account. Moreover, in a letter to Johnson "on behalf of Amazon Services LLC, and Amazon.com Inc. (together 'Amazon')", Amazon stated that it "does not sell personal information" and "confirm[ed] that it has not shared any of Ms. Johnson's personal information which identifies her as having requested, obtained, or viewed specific video materials or services from Amazon."

94.    Amazon's letter demonstrates that Amazon Services shares consumers' data with Amazon Inc. Amazon Services and Amazon Inc. responded to Johnson's request *jointly*, stating that collectively, *both* Amazon Services and Amazon Inc. have not sold Johnson's data or shared any personal information which identifies her as having requested, obtained, or viewed specific video

---

[42] Johnson previously submitted a request to Amazon for her data under Cal. Civil Code § 1798.110 *et. seq.* on July 10, 2024, to which Johnson received only two folders of data—"Digital.Subscriptions.1" and "CustomerCommunicationsExperience.Preferences." After Plaintiffs made allegations regarding the deficiencies of these disclosures in their Second Amended Complaint, Amazon's counsel represented that Johnson had not properly requested all of her data from Amazon, but had only requested data pertaining to her subscriptions. In briefing related to the data request issue, Amazon stated that "[I]f Johnson had a good faith basis for believing Amazon failed to provide all the required data, she could have simply asked[.]" ECF No. 51, p. 13. The October 8, 2024 letter constituted such a specific, additional request, yet Amazon's response to that letter continue to dodge the issue of inter-affiliate sharing.

materials or services from Amazon. This indicates that Amazon Inc. has possession of (and therefore, has accessed) Johnson's data.

95.    Moreover, the data itself demonstrates that Johnson's data has been shared among Amazon affiliates. For example, a spreadsheet titled "Digital Items" cataloging Johnson's digital orders (including video rentals and purchases) lists various Amazon entities as the "Seller of Record." The spreadsheet lists "Amazon.com Services Inc" as the seller of record for the digital order of *Killers of the Flower Moon*. For *Pose Season 2*, on the other hand, "Amazon Digital Services, Inc." is listed as the Seller of Record.[43] According to the Video Terms of Use, Amazon Services is the video service provider for United States Amazon Prime Video consumers, *see supra,* ¶ 73, yet Amazon Services' own data shows that consumers' video rentals and purchases are inevitably tied to other Amazon entities.

96.    Moreover, the response Johnson received from Amazon did not contain anything regarding any co-branded subsidiaries that Amazon Services shared Johnson's data with. Even if none of Johnson's data was sold or shared with affiliates, each Defendant was required to disclose that fact. *See* Cal. Civ. Code § 1798.115(c)(1) ("[I]f the business has not sold or shared consumers' personal information, it shall disclose that fact."); *Id.* § 1798.115(c)(2) (similar); *see also* 105 Cal. Op. Att'y Gen. 26 (2022) ("If a business is unable to comply completely with a request, it is still obliged to provide as much information as it can."). Amazon failed to provide any such disclosures to Johnson.

97.    By responding to Johnson's data request under Cal. Civil Code § 1798.110 *et. seq* collectively as "Amazon," Defendants only confirm that they did not share Johnson's data with

---

[43] These entities are notably distinct from Amazon.com Inc. ("Amazon Inc.") and Amazon.com Services LLC ("Amazon Services").

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                    24

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

unaffiliated third parties. Defendants do not deny that they shared Johnson's PII information between Amazon affiliates.

### E.    Plaintiffs

***Plaintiff Beagle***

98.    Beagle has an Amazon account and has rented videos through that account.

99.    Beagle has also registered for access to Paramount+ and Noggin through her Amazon Prime Video account.

100.    As a United States resident, Beagle contracted with Amazon Services to access Amazon Prime Video.

101.    Beagle did not consent to the disclosure of her PII to Amazon Inc. or other Amazon affiliates.

102.    Beagle has purchased or rented ten items from Amazon Prime Video and has streamed additional video content. Her purchases and rentals include:

| Content Name | Type of Purchase | Date Purchase | Price |
|---|---|---|---|
| *Rudolph the Red-Nosed Reindeer* | Buy | November 26, 2021 | $9.99 |
| *Band of Brothers* | Buy | November 12, 2021 | $14.99 |
| *The Lord of the Rings: The Fellowship of the Ring (Extended Edition)* | Buy | May 25, 2023 | $14.99 |
| *The Lord of the Rings (1978)* | Rent | June 6, 2023 | $3.99 |
| *Steve and Maggie – Christmas Special (Vol. 12)* | Rent | July 7, 2023 | $1.99 |
| *The Angry Birds Movie* | Rent | September 11, 2023 | $3.99 |
| *Pinkfong! Baby Shark & Halloween Songs - Halloween Monster Tree* | Buy | November 21, 2023 | $1.99 |
| *Total Recall* | Buy | December 10, 2023 | $9.99 |
| *Frosty the Snowman* | Buy | December 11, 2023 | $7.99 |
| *Gremlins* | Rent | January 16, 2024 | $3.99 |
| *Star Trek II: The Wrath of Khan* | Rent | February 5, 2024 | $3.99 |

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

26

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

103.    When Beagle purchased and/or rented these videos, Amazon Services collected the content viewed—down to the precise number of seconds watched—along with the name, address, email address, credit card information, and other identifying information for Beagle.[44]

104.    Some of her rentals have also long-since expired, including, for example, *The Lord of the Rings (1978)* (June 6, 2023). Most video rentals through Amazon Prime Video are for 30-day rental periods with a 48-hour watch window once the film is started—including *The Lord of the Rings (1978)*. Beagle has already completed payment for her rentals. Her PII regarding this old rental data is no longer necessary for the purposes for which it was collected. She does not have any outstanding requests to view this information, and Beagle has not been notified of any pending requests or orders for access to this information for other permitted purposes set forth under the VPPA, such as requests pursuant to a court order or law enforcement agency. As such, her PII related to these rentals should have been destroyed months ago (in the case of *The Lord of the Rings (1978)*, approximately August 5, 2023, at the latest). Nonetheless, Amazon Services continues to store this improperly collected PII.

105.    Amazon Services subsequently disclosed that information to Amazon Inc. by providing Amazon Inc. with direct access to Amazon Services' database with information on Beagle, including access to a trove of Beagle's data, including the titles of videos watched, playback start dates and times, playback end dates and times, whether it was a purchase or rental history, billing address, ISP information, and location information.

---

[44] The combination of data collected and disclosed identifies Beagle. For instance, the "PrimeVideo.OutOfAppRecommendationConsent" data return lists her first name as part of her device identification ("Meredith's 3940X"). The "PrimeVideo.TvodOwnership.1" data sheet lists fields including order numbers, show titles, and whether the content was rented or purchased.  And the "Digital Orders" data return connects her "PrimeVideo.TvodOwnership.1" video watch history with her address via the identifying order number. Googling the billing address and the name "Meredith" immediately returns an identifying entry in USPhoneBook for Beagle.

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                             27

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

106.    Amazon Services has Beagle's PII going back to November 16, 2019, but upon information and belief, there are no qualifying, pending requests or orders for access to that information. Even though those orders are long-since completed, Amazon Services has not destroyed that data.

107.    Furthermore, Beagle anticipates buying or renting additional video content in the future, but would like to do so subject to the opt-out provision she is entitled to under the VPPA.

***Plaintiff Guerrero***

108.    Guerrero has an Amazon Prime account and has purchased, rented, and streamed videos through that account.

109.    As a United States resident, Guerrero contracted with Amazon Services to access Amazon Prime Video.

110.    Guerrero did not consent to the disclosure of his PII to Amazon Inc. or other Amazon affiliates.

111.    Guerrero has purchased, rented, or streamed approximately 196 items from Amazon Prime Video, including approximately twelve watched or available in the past couple of years alone:

| Content Name | Type of Purchase | Date Purchase | Price |
|---|---|---|---|
| *Jaws* | Rent | November 6, 2022 | $4.32 |
| *Seven (1995)* | Rent | November 5, 2022 | $4.32 |
| *Fargo* | Rent | November 5, 2022 | $4.32 |
| *The Matrix* | Rent | June 19, 2023 | $4.32 |
| *Roadrunner: A Film About Anthony Bourdain* | Rent | June 8, 2023 | $4.32 |
| *Interstellar* | Rent | June 2, 2023 | $4.32 |
| *The Menu* | Rent | May 6, 2023 | $4.32 |
| *Parasite* | Rent | April 30, 2023 | $4.32 |
| *American History X* | Rent | April 30, 2023 | $4.32 |

| *Arrival* | Rent | February 12, 2023 | $4.32 |
|-----------|------|-------------------|-------|
| *Forged in Fire Season 8* | Buy | December 17, 2020 | $2.15 |
| *The Nightmare Before Christmas* | Buy | Upon information and belief, October 17, 2016 | $10.81 |

112.    When Guerrero purchased, rented, and streamed the videos, Amazon Services collected the content viewed—down to the precise number of seconds watched—along with the name, address, email address, credit card information, and other identifying information for Guerrero.[45]

113.    Some of his rentals go as far back as 2016 and 2017, including, for example, *SLC Punk* (March 2, 2017). Most video rentals through Amazon Prime Video are for 30-day rental periods with a 48-hour watch window once the film is started—including *SLC Punk*. Guerrero has long since paid for such rentals and his PII is no longer necessary for the purposes for which it was collected in relation to these old video rentals. Guerrero does not have any outstanding requests to view this information, and Guerrero has not been notified of any pending requests or orders for access to this information for other permitted purposes set forth under the VPPA, such as requests pursuant to a court order or law enforcement agency. As such, his PII related to these rentals should have been destroyed long ago (in the case of *SLC Punk*, approximately April 1, 2017 at the latest). Nonetheless, Amazon Services continues to store this improperly collected PII.

114.    Amazon Services subsequently disclosed that information to Amazon Inc. by providing Amazon Inc. with direct access to Amazon Services' database with information on Guerrero, including access to a trove of Guerrero's data, including the titles of videos watched, playback

---

[45] The combination of data collected and disclosed identifies Guerreo. For instance, the "registration" data return lists his first name as part of his device account name ("Jay's Android Device'"; "Jay's Kindle Cloud Reader"; etc.). The "PrimeVideo.TvodOwnership.1" data sheet lists fields including order numbers, show titles, and whether the content was rented or purchased.  And the "Digital Orders" data return connects his "PrimeVideo.TvodOwnership.1" video watch history with his address via the identifying order number. A FastPeopleSearch of the billing address returns an identifying entry in FastPeopleSearch for Guerrero.

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                           29

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

start dates and times, playback end dates and times, whether it was a purchase or rental history, billing address, ISP information, and location information.

115.    Amazon Services has Guerrero's PII going back to December 13, 2015, but upon information and belief, there are no qualifying, pending requests or orders for access to that information. Even though those orders are long-since completed, Amazon Services has not destroyed that data.

116.    Furthermore, Guerrero anticipates buying, renting, and streaming additional video content in the future, but would like to do so subject to the opt-out provision he is entitled to under the VPPA.

***Plaintiff Johnson***

117.    In or around 2017, Johnson created an Amazon account.

118.    Johnson has rented and purchased videos on Prime Video through that account. Her digital orders include *The Little Mermaid* (11/2/2022); *Eternals* (7/11/2022); *Dune* (1/24/2022); and *Belly* (7/16/21), among others.

119.    As a United States resident, Johnson contracted with Amazon Services to access Amazon Prime Video.

120.    Johnson did not consent to the disclosure of her PII to Amazon Inc. or other Amazon affiliates.

121.    Johnson purchased or rented videos from Prime Video and has streamed additional video content.

122.    When Johnson purchased and/or rented these videos, Amazon Services collected the content viewed, including the name of the videos watched, the duration watched, and other identifying information such as name, address, email address, and credit card information.[46]

123.    Amazon Services disclosed that information to Amazon Inc., by providing Amazon Inc. with direct access to Amazon Service's database with information on Johnson, including access to Johnson's data, including the titles of videos watched, playback start dates and times, playback end dates and times, whether it was a purchase or rental history, billing address, ISP information, and location information.

124.    Furthermore, Johnson anticipates buying or renting additional video content in the future, but would like to do so without the disclosure of her personal information.

## V.    CLASS ACTION ALLEGATIONS

125.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

126.    Plaintiffs bring this action on behalf of themselves and all other similarly-situated persons as a class action pursuant to Federal Rule of Civil Procedure 23.

127.    Plaintiffs seek to represent a class composed of and defined as follows, and all subject to confirmation, clarification, and/or modification based on discovery to be conducted in this action:

---

[46]    The combination of data collected and disclosed identifies Johnson. For instance, the "PrimeVideo.OutOfAppRecommendationConsent" data return lists her first name as part of her device identification ("Sofauna's 5th G000X"; "Sofauna's 2nd G000X"; "Sofauna's 4th G000X" and "Sofauna's 3rd G000X"). The "PrimeVideo.TvodOwnership.1" data sheet lists fields including order numbers, show titles, and whether the content was rented or purchased.  And the "Digital Orders" data return connects her "PrimeVideo.TvodOwnership.1" video watch history with her address via the identifying order number. Johnson's identity and video watch history are also readily available through the combination of this data. For instance, using TruePeopleSearch.com to search her billing address quickly pulls up an identifying entry for Johnson.

---

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

**All persons nationwide who have rented, purchased, or streamed audiovisual content from Amazon Prime within the applicable statute of limitations and as permitted by applicable tolling periods.**[47]

128.    Johnson also seeks to represent a sub-class composed of and defined as follows and for their California law claims:

**All persons in the State of California who have Prime Video and amazon.com accounts, and viewed videos on Prime Video**.[48]

129.    Excluded from the Class are: (1) Defendants, including any entity in which either defendant has a controlling interest, and any of Defendants' legal representatives, officers, directors, employees, assigns, and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

130.    **Numerosity**: While the exact number of Class Members is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants. Even before the pandemic led to unprecedented growth in online video content services, around 26 million people in the United States streamed videos on Amazon Prime.[49] Therefore, the Class Members are so numerous that the individual joinder of all Class Members is impracticable under Federal Rule of Civil Procedure 23(a)(1).

131.    **Commonality**: There are common questions of law that exist as to all Class Members pursuant to Federal Rule of Civil Procedure 23(a)(2). Because Defendants' Conditions of Use

---

[47] Hereinafter referred to as the "Nationwide Class." Class Period is defined as all video rental, purchase, or streaming within the applicable statute of limitations and any tolling periods.

[48] Hereinafter referred to as the "California Class" and, together with the Nationwide Class, as the "Class."

[49]  https://www.reuters.com/article/us-amazon-com-ratings-exclusive/exclusive-amazons-internal-numbers-on-prime-video-revealed-idUSKCN1GR0FX.

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

require application of federal law, the VPPA governs the claims of all Nationwide Class Members. Similarly, California law applies to all members of the California Class. These common legal and factual issues include:

    a.   Whether Amazon Services has violated the VPPA through its disclosure of personally identifiable information to other Amazon entities without obtaining Nationwide Class Members' informed written consent or providing a clear opt-out provision;

    b.   Whether Amazon Services unlawfully disclosed and continues to disclose its users' PII in violation of California Civil Code § 1799.3;

132.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class Members whom they seek to represent under Federal Rule of Civil Procedure Rule 23(a)(3) because Plaintiffs and each Class Member purchased, rented, and/or subscribed to video content through Amazon Prime; because Class Members seek the same relief under the VPPA (and the California Class Members seek the same relief under California Civil Code § 1799.3); and because Class Members seek the same injunctive relief and nominal damages. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class Members.

133.    **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class Members. Plaintiffs do not have any interest which might cause them to not vigorously pursue this action. There are no conflicts between Plaintiffs and the unnamed Class Members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. Therefore, the interests of the Class Members will be fairly and adequately protected.

134.    Further, Plaintiffs have retained competent counsel, including counsel experienced in complex class action litigation, including consumer protection and privacy cases. Class counsel have experience in complex litigation and have the financial and legal resources to meet the costs and legal issues associated with this type of litigation.

135.    A class action is the superior method for the fair and efficient adjudication of this controversy pursuant to Federal Rule of Civil Procedure 23(b). Prosecuting separate actions on behalf of individual class members would create a risk of inconsistent adjudications while adjudication of issues in one individual matter will be dispositive of those issues in all individual cases. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.

136.    Additionally, questions of law and fact common to Class Members predominate here. There are few difficulties in managing this case as a class action, whereas there are many difficulties associated with proceeding on an individual basis. It would be virtually impossible for individual Class Members to effectively redress the wrongs done to them. Even if the Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on Defendants' extensive consumer files on each claimant.

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                    34

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

# VI.    CAUSES OF ACTION

## A.    Amazon Services' Violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 (As to All Plaintiffs)

137.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

138.    Plaintiffs bring this count under the VPPA, individually and on behalf of the other members of the Class, against Defendant Amazon Services.

139.    Plaintiffs and the Class Members are "consumers" within the meaning of the VPPA because they are renters, purchases, or subscribers of goods or services from Amazon Services. 18 U.S.C. § 2710(a)(1).

140.    Amazon Services is a video tape service provider under the VPPA because it is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

141.    Amazon Services gathers and shares consumers' PII with Amazon Inc. and other affiliates. This information includes "content interaction information, such as content downloads, streams, and playback details, including duration and number of simultaneous streams and downloads, and network details for streaming and download quality, including information about [consumers'] internet service provider."[50]

142.    Amazon Services chose and continues to choose to disclose consumers' PII without the informed, written consent mandated by 18 U.S.C. § 2710(b)(2). The limited, written "disclosures" that Amazon Services provides do not comply with the time limits set forth by VPPA and do not allow the required case-by-case withdrawal or withdrawal on an ongoing basis.

---

[50] Amazon.com Privacy Notice, *supra* note 22.

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                                          35

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

143.    Liquidated damages, punitive damages, reasonable attorneys' fees and litigation costs, and equitable relief should be awarded for Amazon Services' violations of the Video Privacy Protection Act under 18 U.S.C. § 2710(c)(4).

    **B.**    Amazon Services' Violation of California Civil Code § 1799.3 (As to Plaintiff Johnson)

144.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

145.    Johnson brings this claim individually and on behalf of the members of the proposed California Class against Amazon Services.

146.    Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales … services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

147.    Amazon Services is a "person providing video recording sales … services" because it sells access to its online video stream platform, Prime Video, which hosts and delivers thousands of videos on Amazon's Prime Video platforms.

148.    Amazon Services disclosed consumers' PII to Amazon Inc. and other Amazon affiliates. This includes "content interaction information, such as content downloads, streams, and playback details, including duration and number of simultaneous streams and downloads, and network details for streaming and download quality, including information about [consumers'] internet service provider."[51]

149.    Johnson and the California Class members viewed videos using Prime Video.

---

[51] Privacy Notice, https://www.amazon.com/gp/help/customer/display.html/ref=ap_register_notification_%20privacy_notice?ie=UTF8&nodeId=468496.

150. Amazon Services willfully disclosed Johnson's PII because it used that data to for audience measurement purposes, marketing purposes, market research purposes, advertising purposes, and other data collection and analysis purposes.

151. Johnson and the California Class members did not provide Amazon Services with any form of consent—either written or otherwise—to disclose their PII to other parties.

152. On behalf of herself and the Class, Johnson seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Johnson and the Class by requiring Defendant to comply with Cal. Civ. Code § 1799.3's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

A. An order certifying the proposed Class, designating Plaintiffs as named representatives of the Nationwide Class and Johnson as named representative of the Nationwide Class and the California Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

B. For the Nationwide Class, money damages, in the form of stipulated damages of $2,500 per violation from Amazon Services, a video tape service provider, for its violations of VPPA;

C. For the California Class, money statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c);

D. Equitable relief;

E. For punitive damages, as warranted, in an amount to be determined at trial;

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                          37

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

1    F.    Reasonable attorneys' fees and costs;

2    G.    Pre-judgment and post-judgment interest, as provided by law; and

3    H.    Such other and further relief as this Court deems just and proper.

4                              **JURY TRIAL DEMAND**

5    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

6  Procedure, on all claims so triable.

7

8    DATED:  December 9, 2024            Respectfully submitted,

9

                                        **BURNS CHAREST LLP**
10                                       *(Admitted pro hac vice)*

11                                       *s/ Korey A. Nelson*
                                         Amanda K. Klevorn (LA Bar #35193)
12                                       Korey A. Nelson (LA Bar #30002)
                                         Laura S. Seggerman (TX Bar #24134116)
13                                       201 St. Charles Avenue, Suite 2900
                                         New Orleans, LA 70170
14                                       T:  (504) 799-2845
                                         F:  (504) 881-1765
15                                       E:  aklevorn@burnscharest.com
                                             knelson@burnscharest.com
16                                           lseggerman@burnscharest.com

17                                       Cristina Delise (NY Bar #5442033)
                                         Burns Charest LLP
18                                       757 Third Avenue, 20th Floor
                                         New York, New York 10017
19                                       469.904.4550 main
                                         469.663.5940 direct
20                                       469.444.5002 fax
                                         cdelise@burnscharest.com
21
                                         *Interim Co-Lead Counsel for the*
22                                       *Nationwide Class*

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**DUNCAN LAW, PLLC**

*s/ Shaquelle M. Duncan*
Shaquelle M. Duncan (WA Bar #56701)
410 SW 10th Street, Suite 215
Renton, WA 98057
Telephone: (206) 237-7714
Facsimile: (206) 238-1324
Email: duncans@duncanlawpllc.com

*Additional Counsel for Plaintiffs*

**BRAGAR EAGEL & SQUIRE, P.C.**
*(Admitted pro hac vice)*

*s/ Lawrence P. Eagel*
Lawrence P. Eagel (NY Bar #1924067)
  eagel@bespc.com
Casey C. DeReus (LA Bar #37096)
  dereus@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
810 Seventh Avenue, Suite 620
New York, NY 10019
Tel:  (212) 308-5858
Fax: (212) 486-0462

Melissa A. Fortunato (CA Bar #319767)
  fortunato@bespc.com
580 California Street, Suite 1200
San Francisco, CA  94104
Telephone: (415) 568-2124
Facsimile: (212) 304-0506

*Interim Co-Lead Counsel for the
Nationwide Class*

**CARSON NOEL PLLC**

Wright A. Noel
20 Sixth Avenue NE Issaquah, WA 98027
Tel: 425.837.4717
Fax: 425.837.5396
Email: wright@carsonnoel.com

*Additional Counsel for Plaintiffs*

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**BURSOR & FISHER, P.A.**
*(Admitted pro hac vice)*

*s/ Brittany S. Scott*
Brittany S. Scott
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: bscott@bursor.com

Joseph I. Marchese
Philip L. Fraietta
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
Email: jmarchese@bursor.com
        pfraietta@bursor.com

*Additional Counsel for Plaintiffs*

THIRD AMENDED CLASS ACTION COMPLAINT
No. 2:24-cv-00316                                    40

Burns Charest LLP
201 St. Charles Ave., Ste. 2900
New Orleans, LA 70170
(504) 799-2845